Application of MONTILLA RECORDS OF PUERTO RICO, INC., Petitioner, Appellant,

v.

The Honorable Julio MORALES et al., Respondents, Appellees.

No. 77–1199.

United States Court of Appeals, First Circuit.

Argued Feb. 10, 1978.

Decided May 15, 1978.

Irwin Klein, New York City, with whom Ricardo Rechani Acevedo, San Juan, P.R., and Steve Segal, were on brief, for petitioner, appellant.

Charles E. Fitzwilliam, Asst. U. S. Atty., San Juan, P.R., with whom Julio Morales Sanchez, U. S. Atty., San Juan, P.R., was on brief, for respondents, appellees.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

In November, 1976, FBI agents in Puerto Rico received information from an informant, a former employee of Montilla Records of Puerto Rico, Inc. (hereafter Montilla), that Montilla was engaged in the illegal manufacture of Motown records. The FBI investigated these allegations and concluded that Montilla was producing Motown records for which it did not possess licenses as required by copyright law. The FBI sought and received a search warrant, entered Montilla's premises on November 19, 1976, and seized a large quantity of records and recording equipment. No criminal charges have been brought against Montilla since that time. Plaintiffs sought to have their property returned under Rule 41e of the Federal Rules of Criminal Procedure, but the district court denied their motion. Plaintiffs appeal that denial.

At issue in this case is the validity of the search warrant under which the FBI carried out the two day search of the Montilla factory and seized its inventory and equipment. Because we agree with plaintiffs that the warrant in question did not meet the particularity requirements of the Fourth Amendment, we reverse the district court's decision on that ground and have no need to decide the other issues presented to us.

The search warrant authorized the FBI to search for and seize "sound recordings including but not limited to records, cartridges and cassettes which have been manufactured from sound recordings protected by the Copyright Act without the permission of the sound recordings copyright owner, and all records relating to the manufacture, distribution and sale of unauthorized copies of copyrighted sound recordings and all equipment used to copy, manufacture, and test the above described sound recordings." An affidavit detailing the evidence supporting the FBI's contention that there was probable cause to believe that Montilla was engaged in the illegal manufacture of records was presented to the magistrate before the warrant was issued.[1] There is

---

1. The affidavit states in relevant part:

"On November 1, 1976, a confidential source advised that Montilla Records was currently and has been for the past six months involved in the illegal manufacturing of Motown Sound recordings. Source advised that MONTILLA had been previously authorized to manufacture for Motown, but

that the contract had been lost approximately one year ago. Source advised that MONTILLA is utilizing approximately eight to ten masters of the following artists: STEVIE WONDER; DIANA ROSS; DIANA ROSS and MARVIN GAYE; MARVIN GAYE; THE TEMPTATIONS; JACKSON 5; and EDDIE KENDRICKS. Source advised that MON-

nothing in the affidavit that would indicate that any other records produced by Montilla, other than those bearing a Motown label, were manufactured in violation of the copyright law. Nor was there any indication that the Motown production constituted a dominant or even significant part of Montilla's output. However, there is nothing in the search warrant that would indicate to the executing officer that his authority was limited to the seizure of only Motown records. It is obvious from the conduct of the agents who participated in the search that they did not consider their authority to be limited since they examined and seized recordings other than Motown.

■ The purpose of the particularity requirement in search warrants is to "make general searches under them impossible and prevent[s] the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant", *Marron v. United States,* 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1972). Despite this requirement, on occasion the description in a warrant has been accepted by courts although little more than the general class or type of item to be seized was listed. These exceptions involved special contexts in which there was substantial evidence to support the belief that the class of contraband was on the premises and in practical terms the goods to be seized could not be precisely described. *See Spinelli v. United States,* 382 F.2d 871 (8th Cir. 1967), *rev'd on other grounds,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); and *United States v. Scharfman,* 448 F.2d 1352 (2d Cir. 1971). This is not such a case. The warrant here could have easily been circumscribed to permit only the seizure of recordings bearing a Motown label.

In *United States v. Klein,* 565 F.2d 183 (1st Cir. 1977), we affirmed the decision of the district court holding invalid a mass seizure of tapes and tape cartridges under a warrant authorizing the seizure of "unauthorized 'pirate' reproductions". Our concern in that case involved the failure to inform the magistrate issuing the warrant how an agent would distinguish "pirate" tapes from legal merchandize so that the warrant description could effectively limit the agent's discretion. Although it appeared that there were significant visible physical differences between pirate tapes and legitimate tapes which an agent could determine, we held that the failure to delineate what those differences were made the warrant constitutionally invalid.

■ The circumstances in this case are far more egregious. The only Montilla product which the evidence in the affidavit suggested was illegally manufactured was Motown records. These recordings could have been easily differentiated by their labels from the rest of Montilla's inventory. Yet instead of focusing on this obvious description which would have directly limited the executing agent's discretion, the warrant did nothing more than direct the agents to seize all unauthorized or illegal recordings. But there was no evidence presented to the magistrate that Montilla was a "pirate manufacturer" all of whose product was physically distinguishable from that of legal producers. Moreover, unlike the circumstances in *Klein,* there was no clear visual or aural test by which agents could determine which of Montilla's inventory was illegally produced.

Without any physical criteria or detailed description in the warrant to enable them

TILLA usually shipped 1,500 to 3,000 tapes weekly to New York and other areas on Friday afternoons. Source advised that instant date, he had observed Motown eight track tapes being manufactured at Montilla, instant date. Source further advised that the owner of Montilla Records of P.R. was FERNANDO MONTILLA. Source further advised that he believed that JOHN LAMONT who had previously received shipments from the Montilla Records would be the recipient

of the next shipment shipped by Montilla Records. Source believed that LAMONT resided in the New York area."

It then goes on to discuss FBI surveillance of Montilla's premises, further reports by the informant indicating that Motown tapes were being boxed and prepared for shipment, reports on the details of the shipment and its recipient, and the results of a prior court determination that Montilla was no longer licensed to manufacture or duplicate Motown recordings.

to determine what they might lawfully seize, the agents would have to make use of outside sources of information. The only available test would be to evaluate the licensing agreements between Montilla and the companies which owned the recording rights of the artists. Such an evaluation would of necessity involve substantial reliance on the information supplied by the contracting parties.[2] This is precisely the kind of evidentiary evaluation that the search warrant procedure was designed to take out of the hands of police officers in the field and reserve for magistrates and judges. " 'The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' " *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1963), *quoting Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1947). To permit a magistrate to delegate his responsibility for determining whether or not probable cause exists to the officers executing a search warrant, as was done in this case, would be to eliminate the particularity requirement as a restriction on police discretion in searching for and seizing goods.

In *United States v. Drebin,* 557 F.2d 1316 (9th Cir. 1977), the Ninth Circuit considered a seizure of hundreds of film prints and thousands of documents under a warrant to seize " '. . . illegally reproduced and stolen copies of 35mm, 16mm, and 8mm motion picture films which are duly copyrighted and protected by the provisions of the United States Copyright law' . . ." The court concluded that the warrant and subsequent search were unlawful[3] because it "left to the executing officers the task of determining what items fell within the broad categories stated in the warrant. The warrant provided no guidelines for the determination of which films had been illegally produced." *Id.,* at 1322–23. The warrant in this case is no better simply because the related affidavit specifies one type of recording, Motown, which was probably illegal since the warrant and seizure were not limited to that type of recording.

In sum, were this seizure to be upheld, we would signal a rule allowing general warrants with only generic descriptions to issue solely on evidence that particular and easily differentiated contraband of that generic class was to be found on the premises to be searched. This would be an unnecessary and dangerous dilution of search warrant requirements.

*Reversed and remanded to the district court in accordance with this opinion.*

LEVIN H. CAMPBELL, Circuit Judge (concurring).

I agree with the court that the warrant was too broad. As the affidavit afforded probable cause only to search for and seize Motown material, the warrant should have been limited to searching for and seizing like material.

It is clear from the record that a substantial quantity of material other than Motown material was seized by those executing the warrant at Montilla's plant.* Moreover,

---

**2.** It goes without saying that such third party information may be of dubious reliability. Not only is the record producer a self interested party who may interpret its licensing arrangement with licensees such as Montilla for its own benefit, but there is no guarantee that the record producer staff person the agents contact will have the correct and up to date information available to him. Indeed, the agents may receive nothing more than the unauthorized opinion of an underling. All the information

the agents received would, of course, be hearsay.

**3.** The invalidity of the warrant did not require a reversal of defendant's conviction in *Drebin* because unrelated evidence was found to be sufficient to support the lower court's judgment.

\* One agent testified that while executing the warrant, he and the other agents came across materials under the ABC Records label. One

there is no way that the warrant can be read as limited solely to Motown tapes and records. The affidavit, indicating that unauthorized Motown material was being produced, was not incorporated in the warrant by suitable words of reference. *United States v. Klein,* 565 F.2d 183, 186 n.3 (1st Cir. 1977) (*citing United States v. Womack,* 166 U.S.App.D.C. 35, 49, 509 F.2d 368, 382 (1974), *cert. denied,* 422 U.S. 1022, 95 S.Ct. 2644, 45 L.Ed.2d 681 (1975) and *United States v. Lightfoot,* 158 U.S.App.D.C. 177, 181, 506 F.2d 238, 242 (1974)). Therefore, the warrant has to be construed, at face value, as authorizing the seizure of any supposedly illegal tapes and records. However, the affidavit presented to the magistrate did not provide probable cause to believe that this defendant was illegally manufacturing tapes and records other than Motown.

Our *Klein* case was different, in that it related to a retail record-shop which sold to the general public tapes ostensibly produced by various different manufacturers. The affidavit presented to the magistrate indicated the presence in the shop, for sale, of numerous illegal tapes, from which it could be inferred that the suspect was dealing broadly in tapes of that nature. There was thus probable cause to issue a warrant permitting a search of the shop and the seizure of unauthorized pirated tapes that were found there. The problem in *Klein,* leading to disagreement between myself and the court, was not whether there was probable cause to authorize such a search and seizure but whether the warrant contained a description adequate to enable the executing officer to distinguish reliably the articles to be seized. I felt that reference in the warrant to "certain 8-track electronic tapes and tape cartridges which are unauthorized 'pirate' reproductions" was adequate *in that context* to measure up to the particularity requirement of the fourth amendment, es-

pecially since there was evidence that pirated tapes of this type could easily be visually distinguished from authorized ones by their shoddy, amateurish covers and lettering.

Here, however, we deal with a manufacturer, not a retailer. The suspect is a former Motown licensee said, in the affidavit, to be continuing to manufacture Motown items after his license had been terminated. These facts provided probable cause for issuance of a warrant to search for and seize, as evidence of the illegal conduct, items bearing the Motown label or otherwise indicating the illegal production of Motown items.

But they did not give rise, without more, to an inference that other tapes and records found on the premises were similarly being manufactured without a proper license— thus they did not support a warrant for seizure, generally, of other "illegal" items, there being no adequate cause shown to anticipate additional illegality. *See generally Rosencranz v. United States,* 356 F.2d 310, 313–14 (1st Cir. 1966).

Moreover, even had there been probable cause, I would be more troubled in this context than I was in *Klein* about a description of the articles to be seized couched solely in terms of their illegality.

In the *Klein* dissent I said I did

"not mean to suggest that an overly general description in a warrant would in every case be adequately narrowed by limiting seizure to items termed 'illegal'. But if . . . unauthorized 'pirate' items can be distinguished, visually as well as aurally, with a reasonable degree of accuracy, and if identifying them demands judgments that are more factual than legal, the concern that agents will inadvertently or purposely violate personal rights in the course of a seizure under the warrant is greatly diminished."

of the agents apparently telephoned a Mr. Seltski of ABC Records to find out if Montilla was authorized to produce for ABC. The agent stated that ABC's response to the inquiry was that Montilla was not authorized to produce for ABC; the ABC material was therefore seized.

Counsel for Montilla implied that he could repudiate the agent's testimony about Montilla's authorization, and in Montilla's brief on appeal the implication is made express, but we find no record support for this contention.

565 F.2d at 191. I went on to concede that "there are some categories of illicit items so general that an agent could not in most circumstances be expected reliably to pick out the items belonging to the class . . ." *Id.* I think the materials in question here, other than Motown, fall into this latter category. Deciding whether a manufacturer is licensed to produce tapes or records by whoever is entitled to issue licenses requires a legal inquiry into licensing arrangements—a more complex and judgmental task, in most instances, than picking out "pirated" tapes in a retail store, especially where the latter can be visually identified by the quality of their packaging.

I therefore agree with my brethren that on facts such as these the executing officers should not be given carte blanche authority to make, during the search, their own determination of illegality. This kind of determination should be made in advance by the magistrate, the warrant then describing those items of which proof of illegality was furnished.