454 A.2d 24

**COMMONWEALTH of Pennsylvania**

v.

**Floyd SANTNER, M.D., Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 7, 1981.

Filed July 9, 1982.

Reargument Denied Sept. 15, 1982.

Petition for Allowance of Appeal Denied March 3, 1983.

---

68

Burton A. Rose, Philadelphia, for appellant.

Kristine F. Hughey, Assistant District Attorney, Media, for Commonwealth, appellee.

Before SPAETH, MONTGOMERY and LIPEZ, JJ.

SPAETH, Judge:

This is an appeal from a judgment of sentence for violations of the Controlled Substance, Drug, Device and Cosmetic Act. 35 Pa.P.S. § 780–101 *et seq.* Appellant, a medical doctor, was convicted by a jury of dispensing controlled substances to drug dependent persons and of dispensing controlled substances not in the good faith course of professional conduct. 35 Pa.P.S. § 780–113(a)(13) & (14). Appellant argues, among other matters, that the lower court erred in denying his pre-trial motion to suppress evidence obtained from his office because "the search warrants were defective in that they were overly broad in describing the items to be seized and therefore constituted unlawful general search warrants." Appellant's Brief at 6.[1] We agree, and therefore reverse and grant appellant a new trial.

 The particularity clause [2] of the fourth amendment to the United States Constitution provides in pertinent

---

1. Two warrants issued, one authorizing the search of appellant's home, the other the search of his office. Both warrants were based on the probable cause allegations copied at pages 26–27 *infra.* Only the warrant authorizing the office search is included in the reproduced record and is discussed here.

2. The particularity requirement prohibits a warrant that is not particular enough and a warrant that is overbroad. These are two separate, though related, issues. A warrant unconstitutional for its lack of particularity authorizes a search in terms so ambiguous as to allow the executing officers to pick and choose among an individual's

part: [3]

> [N]o warrants shall issue, but upon probable cause ...
> and particularly describing the ... things to be seized.

The United States Supreme Court has stated that "[t]he requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another." *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927). The "general searches" referred to by the Court represented a practice "which has been condemned by Americans since Colonial Days." *United States v. Abrams,* 615 F.2d 541, 543 (1st Cir.1980). Indeed it was popular dissatisfaction with this practice that lead to the adoption of the fourth amendment:

> possessions to find which items to seize. This will result in the general "rummaging" banned by the fourth amendment. *See Marron v. United States,* 275 U.S. 192, 195, 48 S.Ct. 74, 75, 72 L.Ed. 231 (1927). A warrant unconstitutional for its overbreadth authorizes in clear or specific terms the seizure of an entire set of items, or documents, many of which will prove unrelated to the crime under investigation. The officers executing such a warrant will not rummage, but will "cart away all documents." *Application of Lafayette Academy,* 610 F.2d 1, 3 (1st Cir.1979). An overbroad warrant is unconstitutional because it authorizes a general search and seizure. *See* discussion *infra* at 25–26. Of course, the close relationship between these two issues means that some warrants may contain both defects—ambiguity and overbreadth—and may be held unconstitutional on either ground. *See United States v. Abrams,* 615 F.2d 541 (1st Cir.1980) (warrant unconstitutional for lack of particularity, concurring judge would find both defects); *Application of Lafayette Academy, supra* (discussing relationship between lack of particularity and overbreadth). Although appellant blends these issues, it is clear that his argument is that the warrant was unconstitutional for its overbreadth. Appellant's Brief at 6–15.

**3.** The particularity requirement of the Pennsylvania Constitution, article I, section 8, is slightly different from that of the federal constitution, providing in part that: "[N]o warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause ...." The only decision interpreting this requirement holds that it is co-extensive with the federal requirement. *Commonwealth v. Smyser,* 205 Pa.Superior Ct. 599, 211 A.2d 59 (1965). We agree that it affords at least as much protection, for certainly it may not provide less, and do not consider whether "as nearly as may be" provides more protection.

It is familiar history that indiscriminate searches and seizures conducted under the authority of "general warrants" were the immediate evils that motivated the framing and adoption of the Fourth Amendment. Indeed, as originally proposed in the House of Representatives, the draft contained only one clause, which directly imposed limitations on the issuance of warrants, but imposed no express restrictions on warrantless searches or seizures. As it was ultimately adopted, however, the amendment contained two separate clauses, the first protecting the basic right to be free from unreasonable searches and seizures and the second requiring that warrants be particular and supported by probable cause.

*Payton v. New York*, 445 U.S. 573, 583–4, 100 S.Ct. 1371, 1378–9, 63 L.Ed.2d 639 (1980) (footnotes omitted).[4]

■ A warrant is unconstitutional under the fourth amendment for its overbreadth "if it is broader than can be justified by the probable cause on which the warrant is

**4.** In a footnote to this statement the Supreme Court provided additional background:

Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hatred writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of British tax laws. They were denounced by James Otis as 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book,' because they placed 'the liberty of every man in the hands of every petty officer.' The historic occasion of that denunciation, in 1761 at Boston, has been characterized as 'perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. "Then and there," said John Adams, "then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born." ' *Boyd v. United States,* 116 U.S. 616, 625, 6 S.Ct. 524 [529], 29 L.Ed. 746." *Stanford v. Texas,* 379 U.S. 476, 481–482, 85 S.Ct. 506 [509–10], 13 L.Ed.2d 431.

*Id.* 583 n. 21, 100 S.Ct. 1378 n. 21. *And see, Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 325 [99 S.Ct. 2319, 2323, 60 L.Ed.2d 920] (1979) (warrant which did not particularly describe items to be seized "reminiscent of writ of assistance of the 18th century against which the Fourth Amendment was intended to protect.").

based." LaFave, 2 *Search and Seizure* 97 (1978). We believe that an examination of the warrant and the affidavit here demonstrates that the warrant authorized a far broader search than was justified by the probable cause.

The warrant identified the items to be seized as "All Patient/Physician records and charts. All ledgers and bookkeeping pertaining to patients and visits." The affidavit accompanying the warrant stated the following in the "probable cause" section:

Within the past 6 or 7 months, numerous complaints were received from concerned citizens in the neighborhood that there was an inordinate amount of traffic by people in their teens, at the above location, and these people would go into the above persons [*sic*] offices come out, congregate on the street, and would lay on the lawns and sidewalks in the area. The complainants indicated that they believed that the young people were taking some type of drugs. On numerous occassions [*sic*] the above officers conducted surveillances at the above location. On days of surveillances the above officers observed many people, some being in their teens. Many of the people in our opinion and experiences as narcotic officers, did appear to be under the influence of some type of drugs. Our surveillances further revealed that almost ninety-five percent of the people that entered and then left the above location went immediately to the Long Lane Court Pharmacy where, as we observed, the prescription written by the above person was tendered to and filled by the pharmacist. We also observed known drug users to this department, those being John Searle, Moe McNally, Greg Searle. On or about the first week of February, 1978, officer John Falls and other officers from this narcotic unit interviewed Mr. Walter Quinn and Raymond Freeberry, who are pharmacists at the Long Lane pharmacy. They permitted us to examine their records. Our personal examination of the records revealed the following: An excessive amount of class 11 drugs being prescribed by Dr. Floyd A. Santner, for example from

February 1, 1978 to February 24, 1978 15,901 Quaaludes were dispensed, 3,129 Ritalins were dispensed, 903 Percodans were dispensed and 1,023 of other class 11 drugs were dispensed. The total of class 11 drugs dispensed in this 24 day period were 20,966. A check of other records showed that approximately 20,000 Quaaludes are being prescribed by Dr. Santner in an average months [*sic*] time.

A check was made with Dr. Philip Ingaglio, who is the current Chairman of the board of physicians, who handles physician licensure for the State of Pennsylvania. Dr. Ingaglio indicated that the drugs prescribed were, and the quantities prescribed as set forth above were outrageously large. Dr. Ingaglio also felt that this type of practice was not [in] keeping within accepted medical standards. A check with 3 other pharmacies in the same general area revealed that the above quantities were also outrageously high.

The above defendant also advertises, on his billing literature, a practice with a Dr. John Sardar M.D. A check of the records in Harrisburg, Penna. concerning the licensing of physicians indicates that Dr. John Sardar is not licensed in the state of Penna. to practice as a physician, and has never been licensed to practice. State Drug Investigation unit agent, Ester Kiah, went to the above location as a patient several times and each of the times was prescribed a class 2 drug. On February 27, 1978 the above officers interviewed a reliable confidential informant, who has given these officers reliable information in the past, which has led to arrests and convictions, and he related the following.

On several occassions [*sic*] he was a patient at Dr. Santner's office and he did receive Quaaludes, which he was not given a written prescription for, but was told to go to the Long Lane pharmacy to pick them up, which he did.

On February 27, 1978 the above officers interviewed one Hogan Jolly and Calvin Blackwell who are both patients

of Dr. Floyd Santner M.D. and they related to these officers that are both drug addicted persons and are currently on methadone programs in the city of Philadelphia. Both are obtaining class 2 drugs from Dr. Santner. On February 27, 1978 the above officers also interviewed one Cheryl Rementer and she told us that she went to Dr. Santner last year, when she was 15 years of age and told Dr. Santner that she had problems sleeping at night and Dr. Santner prescribed Quaaludes for her. She stated that she went there because her friends told her its [*sic*] easy to get Quaaludes from Dr. Santner.

Based on the foregoing we have reason to believe that the above person at the above location has violated the laws of Penna. dealing with the licensed practice of medicine and the manner in which the practice is to be conducted in that he has conspired with John Sardar and Harrison G. Stone and to allow them to practice without a license, and based on the quantity of traffic into and from the above office, by surveillance, our examination of pharmacy records and our conversation with the referenced physicians, we believe the above Dr. Santner, is prescribing controlled substances for known addicts and controlled substances not being for maintainance for their addiction. These controlled substances or other drugs being prescribed are not in good faith in the course of his professional practice.

As may be seen from these allegations, the affidavit identified eight named individuals whom the officers knew or had interviewed; it further identified, although not by name, a class of individuals whose prescriptions were examined at the Long Lane Court Pharmacy; and it specified two periods—February 1978 and "the past 6 or 7 months"— as the periods during which the activity in question had occurred. Despite this specificity,[5] the warrant was not

---

5. In some cases an insufficiently particular warrant has been "saved" from unconstitutionality by a specific affidavit. *Matter of Property, Etc.*, 644 F.2d 1317 (9th Cir.1981) (warrant accompanied affidavit and used words of incorporation to clarify lack of particularity). Such

restricted either to the files of the eight named individuals, or to the files of the class of individuals whose prescriptions had been examined, or as to time. Instead, it authorized the seizure of *all* of the patients' "records and charts," and *all* "ledgers and bookkeeping pertaining to patients," whether the patients were or were not taking any drugs, and whether they were current patients or had not been patients for many years. The extent of this entirely unnecessary overbreadth may be seen by what happened. The executing officers seized some 3,600 files. Only 50 were introduced in evidence at trial.

While the issue appears to be one of first impression in Pennsylvania, similarly overbroad warrants have been found unconstitutional in the federal courts. *See United States v. Abrams, supra* (warrant did not specify which medical records could be seized and was not limited as to time); *United States v. Roche,* 614 F.2d 6 (1st Cir.1980) (warrant did not specify that only automobile insurance records could be seized); *Application of Lafayette Academy, supra* (warrant did not specify that only documents relating to federal loan program could be seized); *Montilla Records of Puerto Rico, Inc. v. Morales,* 575 F.2d 324 (1st Cir.1978) (warrant did not specify that only records with Motown label could be seized); *Vonder AHE v. Howland,* 508 F.2d 364 (9th Cir.1974) (warrant did not specify that only financial records of taxpayer dentist could be seized but permitted seizure of all records, including personal letters); *United States v. Klein,* 565 F.2d 183 (1st Cir.1977) (warrant not specific as to time); *United States v. DeFalco,* 509 F.Supp. 127 (S.D.Fla.1981) (warrant did not specify which records or films could be seized but authorized seizure of anything reflecting conspiracy between 45 defendants).

In *Application of Lafayette Academy, supra,* the Department of Health, Education and Welfare, investigating a vocational home-study school for possible fraudulent prac-

cases are inapposite here, however, for while the affidavit is specific, the issue is the warrant's overbreadth, not its lack of particularity.

tices incident to participation in the Federal Insured Student Loan Program, obtained a warrant that authorized seizure of the following items:

> "books, papers, rosters of students, letters, correspondence, documents, memoranda, contracts, agreements, ledgers, worksheets, books of account, student files, file jackets and contents, computer tapes/discs, computer operation manuals, computer tape logs, computer tape layouts, computer tape printouts, Office of Education (HEW) documents and forms, cancellation reports and directives, reinstatement reports or forms, Government loan registers, refund ledgers, reports and notes, administrative reports, financial data cards, lesson and grading cards and registers, registration (corporations) documents, student collection reports, financial documents (corporations), journals of accounts and student survey data, which are and constitute evidence of the commission of violations of the laws of the United States, that is violations of 18 U.S.C., Sections 286, 287, 371, 1001 and 1014; ..."

610 F.2d at 3.

The court held that the warrant lacked particularity because it did not specify "the precise nature of the fraud and conspiracy offenses" alleged, *id.*, and also explained in a careful opinion that the warrant was overbroad:

> We have said that a principle [sic] deficiency here is the lack of particularity in the phrase which purports to qualify and delineate the generic categories of items: the description "books, papers ... letters, correspondence, documents, .. which are and constitute evidence of the commission of violations of the [federal conspiracy and fraud statutes]" provides insufficient guidance to the executing officer as to what items from among many he should seize. The qualifying phrase in effect does nothing to limit the broad warrant description. If, of course, the generic descriptions were sufficiently specific and particular standing alone, the defect in the qualifying phrase would be of no effect. For the most part, though,

the categories listed here are too broad. Certainly the description "books, papers . . . letters, correspondence, documents, memoranda, contracts, agreements, ledgers, worksheets, books of account, . . . computer tape/discs, . . . computer tape logs, computer tape layouts, computer tape printouts, . . reports and notes, administrative reports, financial data cards . . . financial documents (corporations), journals of accounts" does not, standing alone in the circumstances of this case, satisfy the fourth amendment. True, it could be argued that as the above description authorizes in effect the search and seizure of *all* books, papers, etc., the warrant does not suffer from a lack of particularity. The directions to the executing officer are straightforward—he is to cart away all documents. But while, so interpreted, the description would be particular enough, it would also be too broad to satisfy the probable cause requirements of the fourth amendment. The affidavit does not establish probable cause to search and seize all of those items.

In contrast to the broad categories of items set forth above, certain of the warrant items may be sufficiently particularized standing alone, for example, "rosters of students," "student files, file jackets and contents," "lesson and grading cards and registers," "student collection reports," and "student survey data." However, while these documentary descriptions may be sufficiently specific, they cover documents antedating Lafayette Academy's participation in FISLP. According to the affidavit in support of the warrant, Lafayette Academy was organized as a correspondence school in 1969 but did not participate in FISLP until 1972. While the affidavit establishes the relevance of post-1972 student documents, it does not indicate any nexus between the earlier student documents and alleged criminal behavior. The warrant thus improperly authorizes the seizure of documents that are apparently irrelevant to the fraud.

*Id.* at 5–6 (footnote omitted).

In *United States v. Abrams, supra,* the Department of Health, Education and Welfare, investigating three doctors who, it believed, were submitting false Medicare bills, obtained a warrant that authorized seizure of the following items:

[T]here is now being concealed certain property, namely evidence of a crime, to wit, certain business and billing and medical records of patients of Doctors Abrams, London, Braun, and Abrams, London and Associates, Inc. which show actual medical services performed and fraudulent services claimed to have been performed in a scheme to defraud the United States and to submit false medicare and medicaid claims for payments to the United States or its agents; in violation of Title 18, United States Code, Section 1001[.]

615 F.2d at 542.

The executing officers seized all of the doctors' Medicaid and Medicare records, and twenty records of patients who were neither Medicare nor Medicaid recipients. The court held that the warrant was void for its lack of particularity:

The warrant at issue fails to meet the requirement of particularity. The officers' discretion was unfettered, there is no limitation as to time and there is no description as to what specific records are to be seized. As a result of this general description, the executing officers seized all of the Medicare and Medicaid records of the three doctors and, in addition, records of non-Medicare-Medicaid patients. It seems clear that the executing officers could not or made no attempt to distinguish bona fide records from fraudulent ones so they seized all of them in order that a detailed examination could be made later. This is exactly the kind of investigatory dragnet that the fourth amendment was designed to prevent.

*Id.* 543 (footnote omitted).

Concurring, Judge CAMPBELL observed that the problem with the warrant was lack of particularity *and* overbreadth:

Unless the necessary judgment is one the executing officers can be expected to perform reliably, a description

identifying seizable items as any that constitute evidence of the particular fraud would seem too general. A related question is the extent to which a warrant may properly authorize the seizure of files containing a jumble of "innocent" as well as "guilty" materials. In the present case, the file of a Medicare-Medicaid patient obviously contains a good deal more material than that which bears on the padded reimbursement claims of the physician. The latter presumably consists mainly of papers showing what actual medical services and procedures were provided, together with copies of the doctor's claim for monetary reimbursement. But the physician may also have retained in the file notes of patient complaints and history, and of his own diagnoses and evaluation. The file could include patient information of a very private nature. *Compare Hawaii Psychiatric Association v. Ariyoshi*, 481 F.Supp. 1028 (D.C.Haw.1979) (enjoining search, pursuant to state administrative warrant, of Medicaid psychiatric patient records). In cases of the present sort, I do not believe that a criminal warrant can properly direct the seizure of each Medicare-Medicaid patient's entire file in a doctor's office, with its mix of relevant and irrelevant materials. As discussed in *Lafayette*, such a warrant might be adequately *particular*, in that it would inform the executing officer precisely what to take (*i.e.*, all files of Medicare-Medicaid patients), but it would violate the probable cause requirement of the fourth amendment, since it would permit the indiscriminate seizure of irrelevant "innocent" materials of a confidential nature along with materials pertinent to the Medicare-Medicaid fraud being investigated.

*Id.* 548–9 (footnote omitted).

These decisions—especially *Abrams*, which involved medical records and closely resembles the present case—demonstrate that the rationale of the lower court [6]—that because

6. The lower court said that:
 In the case at bar, the investigating officers were not blessed with specific information concerning the names of all those to whom the

the officers did not know which specific files to seize, they could seize them all—cannot justify the warrant. We are especially persuaded of this conclusion in view of the fact, discussed above, that the officers had an excellent idea of what specific information they needed, and could easily have made the warrant much less broad, both as to which patients' files could be seized and as to the period of time. The warrant could have been restricted to medical records of the eight known individuals named in the affidavit; it could have been restricted to the medical records of the patients whose records were examined at the pharmacy; and it could have been limited as to time, by, for example, authorizing seizure of the medical records of only those persons who were patients during February 1978, or even during "the past 6 or 7 months." A similar observation regarding possible limitations on a warrant was made by the court in *Abrams:*

In the first place, if an affidavit contains an averment by an employee that fraudulent practices were regularly pursued during his or her employment, and the term of such employment is set forth, the warrant could authorize the seizure of all records of Medicare and Medicaid services billed and purportedly performed during that period. In the second place, if the means of identification required some analysis and matching, *e.g.*, by comparing patients' invoices with records of actual tests performed, this is a sufficient guarantee of particularity. Should the process be deemed too disruptive by the occupant of the premises, he would have the option of agreeing that documents or copies thereof be taken from the premises for the necessary scrutiny. In other words, the person whose premises are to be searched could insist on a search *in situ* rigorously restricted to the directions in

Defendant might have illegally dispensed prescriptions or controlled substances. Rather, the investigation had proceeded to a point where a review of the Defendant's records was necessary. Thus, the warrants necessarily permitted the seizure of all patients' records in order to determine whether and to what extent the probable illegal conduct existed.
Slip op. at 9.

the warrant, with the right to consent to means less physically disruptive.

*Id.* 545.

*See also, United States v. Roche, supra; Montilla Records of Puerto Rico v. Morales, supra.*

The Commonwealth has argued that the "special context exception" justifies the overbreadth of the warrant because "the health and welfare" of "third parties, the doctor's patients, [were] involved." Commonwealth's Brief at 8. This "exception" is less an exception than a "consideration." As the Commonwealth acknowledges, it has only been applied where "there was substantial evidence to support the belief that the class of contraband was on the premises and in practical terms the goods to be seized could not be precisely described." *Montilla Records of Puerto Rico v. Morales, supra* at 326. Furthermore, the Commonwealth fails to note that its argument has been consistently rejected where contraband is not involved.[7] *United States v. Abrams, supra* (medical records); *Montilla Records of Puerto Rico v. Morales, supra* (record albums). As the court in *Abrams* said:

> Business records, although they may contain evidence of fraud, do not fall into the category of stolen or contraband goods. The government has cited no case and we have found none in which a seizure of all records was held valid pursuant to a generally worded warrant such as we have here.

615 F.2d at 545.

The Commonwealth's argument proves too much. Almost every criminal case involves "the health and welfare" of "third parties." Thus, to accept the Commonwealth's

---

7. The distinction between a search for contraband and a search for business records is an historic one. *See Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). Until *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), state agents could not search personal or business files, as distinguished from the "fruits and instrumentalities of crime." It is for this reason that there are so few cases and "[t[he law is largely unformed in this difficult area." *United States v. Abrams, supra* at 549 (concurring op.).

argument would effectively eliminate the doctrine of overbreadth. A warrant could authorize the seizure of all of the personal possessions and records of every suspected murderer, rapist, or arsonist. The Commonwealth seems not to recognize that the purpose of the fourth amendment is not to protect "health and welfare" but privacy. Here, the overwhelming number of appellant's patients—some 3,550—had their personal medical files seized. These files were not introduced at trial, and one can only assume that they were unrelated to the crime under investigation. The state had no business knowing what these patients had told their doctor, and what maladies they had. *See Stanford v. Texas*, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965) (fourth amendment accorded the "most scrupulous exactitude" when first amendment rights are involved); LaFave, 2 *Search and Seizure* 109–111 (1978).

The motion to suppress should have been granted, and we therefore order a new trial.