# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| v. | ) | I.D. No. 2202010805 |
| | ) | |
| EDWARD MARTIN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Submitted: April 21, 2023
Decided: June 16, 2023

*Upon Consideration of Defendant's Motion to Suppress,*
**GRANTED IN PART, DENIED IN PART.**

Martin Cosgrove, Esquire, Amanda Nyman, Esquire, Deputy Attorneys General, Department of Justice, Georgetown, Delaware, *Attorneys for the State of Delaware.*

Daniel Strumpf, Esquire, James Murray, Esquire, Office of Defense Services, Georgetown, Delaware, *Attorneys for Defendant*.

**CONNER, J.**

# INTRODUCTION

Before the Court is Edward Martin's ("Defendant") Motion to Suppress. The Motion to Suppress seeks to exclude evidence obtained from Defendant's residence, Mazda 3, Chevrolet Equinox, SD memory cards and DNA due to unconstitutional searches. After a thorough review of the parties' submissions and oral argument, the Motion to Suppress is **GRANTED IN PART** and **DENIED IN PART.**

# FACTUAL AND PROCEDURAL HISTORY[1]

At approximately 12:50 a.m. police responded to a shooting at Coastal Taproom. Upon arrival police found Arrick Richards (the "victim") on the floor between the bar and billiards table with a gunshot wound to his upper chest. The victim was transported to Beebe Hospital where he succumbed to his injuries shortly after arrival. After the altercation, Defendant and his wife, Christie Martin, left Coastal Taproom through the front doors and drove home together in a Chevrolet Equinox.

At the scene police interviewed multiple witnesses and employees. From those interviews police gleaned that an argument occurred between patrons in the billiards table area. The incident was caught on Coastal Taproom's surveillance

---

[1] This factual background is based on testimony given at the preliminary hearing, search warrants, affidavits and the parties' briefings.

1

cameras. With the help of the employees, surveillance video and credit card receipts, the police quickly narrowed their suspect search to Defendant.

Through further investigative measures police were able to identify Defendant's address and another vehicle, a Mazda 3, as the last vehicle Defendant was ticketed in. Police officers then headed to Defendant's address in Millsboro, Delaware. Two officers were conducting surveillance on Defendant's residence when they observed a vehicle matching the description of the Mazda 3 with a white male operator turn into Defendant's neighborhood. The officers followed the vehicle and activated their lights. One officer observed the vehicle operator reaching or moving something near the front passenger side. By the time the officer reached the passenger side of the vehicle Defendant had his hands up and made a statement to the effect of "you got the right guy." Defendant was then taken into custody without incident. A plain view inspection of the vehicle revealed a handgun on the front passenger seat that was taken as evidence.

While standing outside Defendant's residence, an officer looked in the culvert pipe that ran under the driveway and discovered an empty handgun holster and a large amount of 9-millimeter ammunition. According to the officer the evidence was clean and freshly placed.

Also happening within this same timeframe was the arrest of Defendant's wife. Christie Martin returned to Coastal Taproom in a Chevrolet Equinox to retrieve a cellphone she left behind. Upon approaching the doors of the establishment, police officers questioned Christie about why she was there. Suspecting her to be under the influence, officers conducted a DUI investigation and arrest. An employee of Coastal Taproom recognized Christie and informed officers she was the woman that was with Defendant during the shooting.

After Christie was arrested she was questioned by detectives about the shooting. She stated her and Defendant arrived together and left together in a Chevrolet Equinox. She also identified herself and Defendant in the surveillance video but would not admit to knowing anything about the shooting. Christie told officers that after leaving Coastal Taproom her and Defendant returned home to their shared residence.

Defendant filed this Motion to Suppress on February 27, 2023. The State responded on March 17, 2023. The Court scheduled a Suppression Hearing for March 31, 2023. The parties declined the opportunity to present evidence and instead used the hearing for oral argument.

**STANDARD OF REVIEW**

When a defendant challenges the validity of a search warrant with a motion to suppress the defendant bears the burden of proving the challenged search or seizure was unlawful.[2] After a defendant challenges the validity of the search, the reviewing Court employs a "four corners" test in which the Court must determine if the affidavit "set[s] forth sufficient facts on its face for a judicial officer to form a reasonable belief that an offense has been committed and that seizable property would be found in a particular place."[3] The warrant must also describe with sufficient particularity the places to be searched.[4]

The magistrate's initial determination of probable cause is owed great deference.[5] The magistrate's findings will not be "invalidated by a hypertechnical, rather than a common sense, interpretation of the warrant affidavit."[6]

**DISCUSSION**

As a threshold matter, at the oral argument and in the State's Response to Defendant's Motion to Suppress, the State represented to the Court that it had no

---

[2] *State v. Sisson*, 883 A.2d 868, 875 (Del. Super. 2005), *aff'd*, 903 A.2d 288 (Del. 2006).
[3] *State v. Chaffier*, 2023 WL 1872284, at *3 (Del. Super. Feb. 9, 2023).
[4] *Id.*
[5] *Id.*
[6] *Cooper v. State*, 228 A.3d 399, 404 (Del. 2020).

intention of introducing any evidence from either of Defendant's cellphones. As such, all of Defendant's arguments pertaining to the two cell phones are moot.

## I.     Applicable Law

A majority of Defendant's arguments stem from the search warrants being general, overbroad, or unsupported by probable cause. A general warrant affords police officers "blanket authority to indiscriminately search persons, houses, papers, and effects."[7] To avoid these types of general searches, the particularity requirement of the Fourth Amendment demands warrants describe "the things to be searched with sufficient particularity and be no broader than the probable cause on which it is based."[8]

On the other hand, an overbroad warrant "describe[s] in both specific and inclusive generic terms what is to be seized, but it authorizes the seizure of items as to which there is no probable cause."[9] An overbroad warrant has also been defined as one which "authorizes in clear or specific terms the seizure of an entire set of items, or documents, many of which will prove unrelated to the crime under investigation."[10]

---

[7] *Wheeler v. State*, 135 A.3d 282, 296 (Del. 2016).
[8] *Id.* at 298-99.
[9] *Id.* at 296.
[10] *State v. Fink*, 2002 WL 312882, at *4 (Del. Super. Feb. 25, 2002) (quoting *Com. v. Santner*, 454 A.2d 24, n.2 (Pa. Super. 1982)).

To establish probable cause there must be a logical nexus between the place to be searched and the items sought.[11] "[T]he information set forth within the affidavit's four corners, and any logical inference from the specific facts alleged, must demonstrate why it was objectively reasonable for the police to expect to find the items sought in those locations."[12]

With a synopsis of the applicable law in mind, the Court will now turn to each of Defendant's arguments.

## II. Residence

### A. *General*

Defendant argues the search warrant regarding his residence was a general warrant because it authorized the police to conduct an unrestrained rummaging of the entire contents of his home.[13] Defendant takes specific issue with language in the warrant that states "any article, item and or document to provide information on the reason for this criminal act."[14] Considered alone, it could be argued that the language was general. However, when read in conjunction with the other seven items listed

---

[11] *Dorsey v. State*, 761 A.2d 807, 811 (Del. 2000).
[12] *Id.* at 812.
[13] Def. Mot. to Suppress ¶ 12.
[14] *Id.*

under the "ITEMS TO BE SEARCHED FOR AND SEIZED" section of the application, the language was not general.

Instructive on this matter is the Delaware Supreme Court case *Fink v. State*.[15] In *Fink*, the defendant raised a similar issue, arguing the language "client files including, but not limited to" was too broad in scope and did not limit the search to items for which probable cause had been established.[16] The Supreme Court ruled otherwise, holding that the language was neither vague nor ambiguous.[17] Additionally, the Supreme Court looked to the more specific terms in the warrant and found those provided reasonable limitations on the scope of the search.[18] The warrant in *Fink* was not deemed a general warrant.[19]

Here, the search warrant did not contain any vague or ambiguous terminology. It is clear the police officers were searching for evidence pertaining to the shooting at Coastal Taproom. This is further narrowed by the search warrant specifically referencing ballistics evidence, trace evidence, clothing Defendant and his wife were wearing and anything containing blood stains. There was no uncertainty as to what the police officers were supposed to be searching. The search warrant did not

---

[15] *Fink v. State*, 817 A.2d 781 (Del. 2003).
[16] *Id.* at 786.
[17] *Id.*
[18] *Id.*
[19] *Id.*

authorize blanket authority to search and was as particular as possible at that point in the investigation.

Defendant also argues the search warrant was general because the warrant did not define trace evidence and authorized police to seize "trace evidence including but not limited to blood, hair, fibers, fluids, and fingerprints."[20] It appears trace evidence was defined as the affiant listed multiple examples of it. The Court also notes trace evidence is commonly referred to and does not require extensive defining.

In *State v. Hamilton*, a search warrant for a residence contained the language "[a]ny and all trace evidence to include but not be limited to blood, hair, fibers, fluids and fingerprints."[21] The Court did not suppress any evidence seized and found the warrant permissible.

Here, the language is essentially the same. The investigators did not have unbridled discretion to search and seize any item. Furthermore, trace evidence, like the types listed in the search warrant, was not outside the permissible scope and was clearly defined. Accordingly, the language regarding the trace evidence was not general.

---

[20] Def. Mot. to Suppress ¶ 13.
[21] *State v. Hamilton*, 2017 WL 4570818, at *21 (Del. Super. Oct. 12, 2017).

B. *Overbroad*

Defendant next argues the search warrant was overbroad because it authorized police officers to search for items which were unsupported by probable cause.[22] More specifically, Defendant argues the police officers exceeded the scope when they "seized rifles, ammunition and other firearms accessories which were clearly not used during the alleged offense or associated with a 9-millimeter handgun."[23]

The warrant authorized police officers to search for "[b]allistics evidence including weapons, ammunition, projectiles, and fired cartridge casings which may have been used during this crime."[24] The alleged crime was a shooting at a bar. Although a 9-millimeter shell casing was found inside the Coastal Taproom, police were unaware of the exact weapon used in the shooting. Searching and seizing ballistics evidence in an ongoing shooting investigation was not outside the scope of probable cause. The warrant was not overbroad.

C. *Unsupported by Probable Cause*

Defendant argues the search warrant was unsupported by probable cause because it failed to establish a nexus between the items sought and Defendant's

---

[22] Def. Mot. to Suppress ¶ 14.
[23] *Id.*
[24] *Id.* Ex. A. at 1.

residence.[25] Defendant takes specific issue with the alleged lack of nexus between his residence and the home surveillance system.[26] The Court will discuss probable cause for the surveillance camera footage under the "SD Memory Cards" section of this opinion.

### D. *Findings*

The Court finds the search warrant for Defendant's residence was not general or overbroad. The warrant did not grant police officers blanket authority to search Defendant's home nor did the warrant authorize the seizure of items unsupported by probable cause. Accordingly, Defendant's Motion to Suppress regarding his residence is **DENIED.**

## III.   Mazda 3

### A. *General*

Defendant argues the search warrant for the Mazda 3 was a general warrant because it contained the language "including but not limited to, processing for latent prints and possible DNA collection of non-human/physical items."[27] As previously discussed, the including but not limited to language does not automatically render a search warrant general. In *Fink v. State*, other language contained in the search

---

[25] Def. Mot. to Suppress ¶ 16.
[26] *Id.*
[27] *Id.* ¶ 18.

warrant placed reasonable limitations on the scope of the search.[28] Here, the language succeeding "including but not limited to" limited the scope. Clearly, the investigators were seeking DNA evidence and latent prints. Other items enumerated in the warrant also limited the scope.[29] The warrant did not provide investigators with blanket authority to indiscriminately search the Mazda 3.

### B. *Overbroad*

Defendant argues the search warrant was overbroad because it authorized investigators to search for any ballistics evidence instead of ballistics evidence related to a 9-millimeter handgun.[30] As previously discussed, investigators were unaware of the exact weapon used in the shooting. It was not outside the scope of probable cause to search and seize ballistics evidence in an ongoing shooting investigation. The warrant was not overbroad.

### C. *Unsupported by Probable Cause[31]*

---

[28] *Fink*, 817 A.2d at 786.

[29] The search warrant for the Mazda 3 also authorized investigators to search for biological fluids, electronic devices, ballistics evidence, and clothing items Defendant and Defendant's wife were seen wearing.

[30] Def. Mot. to Suppress ¶ 19.

[31] Defendant argues the search of his wallet violated his constitutional rights. However, the State represented to the Court at the oral argument that the search of the wallet was incident to Defendant's arrest. According to an Investigative Narrative prepared by Trooper First Class White, Defendant was searched incident to arrest and his wallet with the Visa card inside of it was found on his person. After the search TFC White placed the wallet containing the Visa back inside the car on the front driver's side seat. The Mazda 3 was later towed to Troop 7 where the wallet and Visa card were collected and entered as evidence, which is why the wallet and Visa card also appear on the evidence log. The wallet was not impermissibly seized from the Mazda 3.

Defendant argues the search of the Mazda 3 was unsupported by probable cause because there was nothing linking the Mazda 3 to the shooting other than Defendant driving it at the time of his arrest.[32] Additionally, Defendant argues the affidavit did not establish a nexus between the clothing items sought and the Mazda 3.[33]

Through investigative measures, the police were aware Defendant was associated with a gray Mazda 3. The police were also aware Defendant returned home after the shooting. Based on this information, officers headed to Defendant's residence. While patrolling the neighborhood, officers saw the Mazda 3 and a man matching Defendant's description in the driver's seat. Defendant was subsequently pulled over. After being pulled over, Defendant inquired about the status of the victim and told the police officer he "had the right guy." As the affidavit stated, these events occurred just a short time after the shooting.[34] It was logical for police officers to assume they might find evidence in a vehicle driven by Defendant so close in time to the crime.

Furthermore, a nexus existed between the Mazda 3 and the clothing. In the warrant application, the affiant described certain clothing pieces investigators were

---

[32] Def. Mot. to Suppress ¶ 20
[33] *Id.* ¶ 21.
[34] *Id.* Ex. B.

seeking. The affiant stated, "specifically a long sleeve men's shirt, a pair of men's jeans, a white baseball style hat, and a black women's shirt which exposes the shoulder area."[35] Although the affiant could have been more particular when explaining the need for those items of clothing, a logical inference can be drawn. The affiant's description of the clothing items would lead an objectively reasonable person to infer those were the clothing items worn by Defendant and Defendant's wife and those clothing items might be present in the vehicle driven by Defendant shortly after the shooting. A nexus was established between the Mazda 3 and the clothing items.

D. *Findings*

Important to remember is the great deference given to the magistrate's probable cause determination.[36] This Court's role is to review the magistrate's determination as a whole and from a commonsense standpoint, not conduct a hypertechnical analysis of each allegation.[37] The Court finds the search warrant for the Mazda 3 was not general or overbroad. The warrant did not grant police officers blanket authority to search Defendant's vehicle nor did the warrant authorize the seizure of items unsupported by probable cause. Additionally, a nexus was

---

[35] *Id.*
[36] *Sisson*, 883 A.2d at 880.
[37] *Id.* at 876.

established between the Mazda 3 and the items sought. Therefore, Defendant's Motion to Suppress regarding the Mazda 3 is **DENIED.**

## IV.    Chevrolet Equinox

Defendant argues the seizure of a pool cue from the Chevrolet Equinox exceeded the scope of the warrant.[38] During oral argument, the State mostly agreed that seizure of the pool cue exceeded the scope of the warrant. The Court agrees seizure of the pool cue exceeded the scope and therefore Defendant's Motion to Suppress regarding the pool cue is **GRANTED.**

### A. *General*

Defendant argues the search warrant was general because it authorized investigators to search for "any article, item or document to provide information on the reason for this criminal act."[39] The same analysis as above is applicable. The warrant contained reasonable limitations on the scope of the search. Investigators did not have unbridled discretion to search and seize.

---

[38] Def. Mot. to Suppress ¶ 26.
[39] *Id.* ¶ 23.

Defendant also argues the warrant was general due to the language "trace evidence including but not limited to blood, hair, fibers, fluids and fingerprints."[40] Again, the analysis is the same as above. Trace evidence is commonly referred to and appropriately defined. Furthermore, the Court in *Hamilton* did not suppress any evidence seized from a search warrant that contained almost identical language.[41] The investigators here did not have unbridled discretion to search and seize any item. Accordingly, the language regarding the trace evidence was not general.

### B. *Findings*

The search warrant for the Chevrolet Equinox was not a general warrant. A commonsense analysis of the warrant as a whole shows the police officers were not afforded blanket authority to search the Chevrolet Equinox. The warrant was sufficiently particular and based on probable cause. Therefore, Defendant's Motion to Suppress regarding the Chevrolet Equinox is **DENIED.**

## V. SD Memory Cards

### A. *"Sloppy" Language*

Defendant takes issue with language in the search warrant for the SD Memory Cards, specifically:

---

[40] *Id.* ¶ 24.
[41] *Hamilton*, 2017 WL 4570818, at *21-22.

The following data and the forensic examination thereof, stored by whatever means on two Samsung 128 Evo Select Mini SD memory cards, to include: pictures, images, video recordings, files, location service information, and internet websites, stored on the cellular telephone of unknown individual during the timeframe of 2000 hours on 02/19/22 through 0400 hours on 02/20/22.[42]

Defendant argues this language limited the police to search only the cell phones and did not authorize the search of the SD Memory Cards.[43] The Court notes the language of the warrant appears to be a sloppy cut and paste job. However, the Court does not agree that the language limited the search to only the cell phones. The language specifically stated the investigators intended to search the data stored on two Samsung 128 Evo Select Mini SD memory cards. Poor drafting alone does not invalidate a warrant nor render it unconstitutional.

B. *Unsupported by Probable Cause*

As previously mentioned, the Court will now discuss the probable cause for the search of the surveillance camera SD memory card footage. Defendant argues there was a lack of probable cause to search the footage stored on the SD memory card taken from inside the surveillance camera because the affidavit failed to establish a nexus between the SD memory card footage and the residence.[44]

---

[42] Def. Mot. to Suppress ¶ 44.
[43] *Id.* ¶ 45.
[44] *Id.* ¶ 16.

16

Based upon statements given by Defendant's wife to investigators, the police were aware that Defendant and his wife returned home after the shooting. The affidavit of probable cause stated the purpose of viewing the SD memory card surveillance footage was to establish a timeline of events from before and after the shooting. Since investigators were aware that Defendant returned home following the shooting, it was logical to assume Defendant's actions were captured on the SD memory card taken from the camera pointed directly at the driveway, street, and front of Defendant's residence. A nexus was established between the SD memory card data and the residence.

Defendant also argues the affidavit failed to establish a factual basis upon which a neutral magistrate could have concluded the surveillance data investigators sought would be on the SD memory card located in Defendant's pocket at the time of his arrest.[45] The Court disagrees. The affidavit specifically stated the SD memory card recovered from Defendant's pocket was similar to the one taken from the surveillance camera. The SD memory card was found on Defendant's person shortly after the shooting occurred. It was logical for the magistrate to assume the similar SD memory card found in Defendant's pocket may have been removed from the surveillance camera and contained video evidence.

---

[45] *Id.* ¶ 46.

C. *Findings*

Again, it is not the role of this Court to conduct a hypertechnical analysis of the magistrate's findings. Here, the affidavit established probable cause for the search of both the SD memory card taken from the surveillance camera and the SD memory card taken from Defendant's pocket. Accordingly, Defendant's Motion to Suppress regarding the two SD Memory Cards is **DENIED.**

## VI. DNA

A. *Two DNA Warrants*

Defendant's DNA was originally taken pursuant to a search warrant executed on February 20, 2022. The February DNA warrant contained an improper header in the affidavit of probable cause section. The State decided to exercise caution and executed a second search warrant for Defendant's DNA that contained the correct header throughout the entirety of the warrant application. The second warrant application contained exactly the same information as the first warrant with the exception of the corrected heading and an additional paragraph explaining the error.

The Court is unaware of any case law that supports the contention that a scrivener's error invalidates a search warrant. Additionally, both the first and second DNA warrants established the required probable cause and were properly executed.

Defendant was unable to provide any support for his argument that obtaining a second warrant invalidated the first warrant. As such, both warrants were valid.

### B. *Franks Hearing*

Defendant contends a *Franks* hearing is needed because the police knowingly or with reckless disregard for the truth relied on a false statement to establish probable cause.[46] Specifically, Defendant argues the affiant relied on stale information and if the stale information was removed from the affidavit, no nexus of probable cause could be established.[47]

The Court finds no need for a *Franks* hearing as no false information was relied upon. It does not matter that the police became aware the .45 caliber Smith and Wesson handgun recovered from the front seat of the Mazda 3 was not the murder weapon. No where in the affidavit does the affiant state the Smith and Wesson handgun was the murder weapon, nor is there any Delaware case law that states the evidence police recover to take DNA samples from to compare to Defendant's DNA swab must be the murder weapon used in the crime. Additionally, the gun recovered from the Mazda was legally seized evidence and was appropriate for comparison to Defendant's DNA.

---

[46] *Id.* ¶ 49.
[47] *Id.* ¶ 50.

C. *Unsupported by Probable Cause*

As mentioned above, Defendant contends the search warrant for his DNA was unsupported by probable cause because of the false information relied upon. The information relied upon was not false. The affiant did not state that the gun recovered from the Mazda was the murder weapon. The affiant simply stated Defendant's DNA would be compared to the gun recovered from the Mazda as well as various other evidentiary items found at the crime scene.[48]

A finding of probable cause is not automatically rejected on nexus grounds simply because the affiant does not state a DNA sample has already been recovered from the crime scene.[49] What is required for the probable cause nexus to be established is a fair probability the seized DNA sample can be linked to the crime.[50]

Here, the affiant stated, among other things, he has been employed by the Delaware State Police since 2003, has investigated numerous deaths, received special training in searches and seizures, and has prepared and assisted with the execution of search and seizure warrants.[51] Furthermore, the affiant stated that:

> through his training and experience, DNA can be transferred in many ways, to include basic physical contact, from an individual to a property item, or another

[48] *Id.* Ex. G.
[49] *State v. White*, 2017 WL 1842784, at *5 (Del. Super. May 8, 2017).
[50] *Id.*
[51] Def. Mot. to Suppress Ex. G.

individual. In this particular investigation, when any property item, such as a handgun, or any other physical item comes into contact with a human being, the transfer of DNA can occur through skin cells, oils, or other biological materials to include blood through physical contact.[52]

The affiant explained that Defendant had been linked to the crime scene from video surveillance, witness statements and purchase transactions.[53] Although the .45 caliber Smith and Wesson handgun recovered from the Mazda 3 was not the weapon used during the crime, it was found on the passenger seat of the vehicle Defendant was driving at the time of arrest. Common sense dictates it was likely Defendant touched the gun and transferred his DNA to it. Additionally, as stated in the affidavit, investigators had recovered other evidence from the crime scene that they could use to compare with Defendant's DNA.

D. *Findings*

The nexus requirement for a finding of probable cause existed. Due to Defendant's known presence at the scene of the crime and video surveillance showing him firing a gun at the victim, a fair probability that Defendant's DNA can be linked to the crime has been established. Accordingly, Defendant's Motion to Suppress regarding his DNA is **DENIED.**

---

[52] *Id.*
[53] *Id.*

## CONCLUSION

When viewing each challenged warrant as a whole, a factual basis was provided for a neutral magistrate to conclude evidence pertaining to the shooting investigation would be found at each location. The challenged warrants were not unconstitutionally general or overbroad.[54] The Court finds each warrant to be valid.

Accordingly, Defendant's Motion to Suppress the pool cue taken from the Chevrolet Equinox is **GRANTED.** Defendant's Motion to Suppress evidence taken from his residence, Mazda 3, SD Memory Cards, DNA and the remainder of evidence taken from the Chevrolet Equinox is **DENIED.**

**IT IS SO ORDERED.**

/s/ *Mark H. Conner*

Mark H. Conner, Judge

cc: Prothonotary

---

[54] With the exception of the pool cue seized from the Chevrolet Equinox.