J-A27031-17

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| ROBERT FERRANTE, | : | |
| | : | |
| Appellant | : | No. 660 WDA 2015 |

Appeal from the Judgment of Sentence February 4, 2015
in the Court of Common Pleas of Allegheny County,
Criminal Division, No(s):  CP-02-CR-0013724-2013

BEFORE:  BENDER, P.J.E., SHOGAN and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:  **FILED JANUARY 18, 2018**

Robert Ferrante ("Ferrante") appeals from the judgment of sentence entered following his conviction of first-degree murder.  ***See*** 18 Pa.C.S.A. § 2502.  We affirm.

We adopt the thorough and comprehensive summary of the factual history of this case, as set forth in the Opinion of the Honorable Jeffrey Manning, for the purpose of this appeal.  ***See*** Trial Court Opinion, 9/15/16, at 4-23.

Briefly, the Commonwealth's evidence established that at 11:18 p.m., on April 17, 2013, Autumn Klein, M.D., Ph.D. ("Dr. Klein"), was seen leaving Presbyterian University Hospital, her place of employment.  Upon arriving at her residence, Dr. Klein collapsed.  At 11:52 p.m., Dr. Klein's husband, Ferrante, called for an ambulance.  Pittsburgh paramedics Jerad Albaugh and Steve Mason arrived at the residence, where they found Dr. Klein

unconscious on the kitchen floor. Ferrante told the paramedics that he was upstairs when Dr. Klein had entered the home, and discovered Dr. Klein when he came downstairs. Ferrante explained to paramedics that a zip lock bag containing a white powder, found in the kitchen, contained creatine. Ferrante explained that Dr. Klein took the creatine to help with fertility.

At the hospital, Andrew Farkas, M.D. ("Dr. Farkas"), asked Ferrante whether Dr. Klein had suffered previously from headaches. Ferrante stated that right before collapsing, Dr. Klein had complained of not feeling well. When placing an IV, Dr. Farkas observed that Dr. Klein's blood was bright red. Dr. Klein was subsequently transferred to the intensive care unit ("ICU"). Three days later, the supervising physician in the emergency room, Thomas Martin, M.D. ("Dr. Martin"), told Dr. Farkas that the results of Dr. Klein's blood test indicated the presence of a high level of cyanide. Dr. Farkas contacted the Allegheny County Medical Examiner's Office and informed them of his concerns regarding Dr. Klein. Dr. Klein was pronounced dead on April 20, 2013.

On July 24, 2013, Ferrante was charged with one count of criminal homicide for the death of Dr. Klein. A jury ultimately convicted Ferrante of first-degree murder. Following the preparation of a pre-sentence investigation report, the trial court sentenced Ferrante to life in prison. Ferrante filed post-sentence Motions and supplemental post-sentence Motions, all of which the trial court denied. Ferrante filed a Motion to

reconsider the denial of his post-sentence Motions, which the trial court also denied. Thereafter, Ferrante timely filed a Notice of appeal, followed by a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

Ferrante raises the following claims for our review:

I. Whether the Commonwealth had a duty to disclose to [Ferrante] before trial that [the] Nichols Institute ("Nichols"), a/k/a Quest Diagnostics, [Incorporated ("Quest"),] had a criminal conviction and had committed other bad acts which were relevant to the reliability of the Quest cyanide test result introduced at trial?

II. Whether the evidence was insufficient to sustain a conviction of first-degree murder?

III. Whether the guilty verdict of first-degree murder was against the weight of the evidence?

IV. Whether the [trial] court erred in denying [Ferrante's] suppression Motions [Nos.] 1, 20, 24, 28, 38, 60, 63, [and] 64[,] [and] allowing the fruits of the Commonwealth's illegal searches and seizures to be introduced at trial against [Ferrante]?

Brief for Appellant at 1.

Ferrante first claims that the Commonwealth violated the United States Supreme Court's holding in **Brady v. Maryland**, 373 U.S. 83 (1963), by not disclosing that a subsidiary of Quest, Nichols Institute[1] had a prior *crimen falsi* conviction. Brief for Appellant at 20. Ferrante argues that the Commonwealth had an affirmative duty to disclose exculpatory evidence,

---

[1] Ferrante argues that, the fact that Nichols was a subsidiary of Quest is a distinction without a difference, as the two are "interchangeable," as Quest had paid Nichols's criminal and civil fines. Brief for Appellant at 24.

even though there had been no request for such evidence by the accused. *Id.* Ferrante contends that after trial, his counsel discovered that Nichols had been convicted of a felony, for which it paid a fine of $40 million. *Id.* Ferrante additionally points out that Quest had paid $241 million to settle claims regarding Nichols's violations of the False Claims Act, for systematically overcharging California's Medi-Cal program for over 15 years. *Id.* at 21. Ferrante states that a determination of the cause of Dr. Klein's death depended upon the reliability of Quest's tests of Dr. Klein's blood. *Id.* Regardless of whether the Commonwealth knew of this information, Ferrante claims that the Commonwealth had an obligation to find out and disclose Nichols's prior criminal conviction and bad acts. *Id.* at 22. Ferrante asserts that these criminal convictions, "as well as the numerous lawsuits, are reflective of [the] lax standards and unreliable testing methods" of Quest. *Id.*

"In *Brady*, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment[,] irrespective of the good faith or bad faith of the prosecution." *Commonwealth v. Burke*, 781 A.2d 1136, 1141 (Pa. 2001) (internal quotation marks and citation omitted).

> Pursuant to *Brady* and its progeny, the prosecutor has a duty to learn of all evidence that is favorable to the accused which is known by others acting on the government's behalf in the case, including the police. *Kyles v. Whitley*, 514 U.S. 419, 437, 115

S. Ct. 1555, 131 L. Ed. 2d 490 (1995). Pursuant to *Kyles*, "the prosecutor's *Brady* obligation clearly extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution." *Commonwealth v. Burke*, 566 Pa. 402, 781 A.2d 1136, 1142 (Pa. 2011). Moreover, there is no *Brady* violation when the defense has equal access to the allegedly withheld evidence. *See Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1248 (Pa. 2006) ("It is well established that no *Brady* violation occurs where the parties had equal access to the information or if the defendant knew or could have uncovered such evidence with reasonable diligence." (internal citation omitted)).

*Commonwealth v. Weiss*, 81 A.3d 767, 783 (Pa. 2013).

Our Supreme Court has explained that, in order to establish a *Brady* violation,

a defendant must show that: (1) evidence was suppressed by the state, either willfully or inadvertently; (2) the evidence was favorable to the defendant, either because it was exculpatory or because it could have been used for impeachment; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant. However, [t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense. Rather, evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Commonwealth v. Willis*, 46 A.3d 648, 656 (Pa. 2012) (internal quotation marks and citations omitted).

Pennsylvania Rule of Criminal Procedure 573 codified the United States Supreme Court's holding in *Brady*:

*Mandatory.* In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth

- 5 -

might obtain under this rule, **the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case.** The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.

(a) Any evidence favorable to the accused that is material either to guilt or to punishment, **and is within the possession or control of the attorney for the Commonwealth**[.]

Pa.R.Crim.P. 573(B)(1)(a) (emphasis added).

We have reviewed the parties' arguments regarding this claim, as set forth in their briefs, and the record certified to this Court on appeal. Further, we have reviewed the trial court's comprehensive and well-reasoned Opinion with regard to this claim. *See* Trial Court Opinion, 9/15/15, at 39-40. We agree with the sound reasoning of the trial court, as set forth in its Opinion, and affirm on this basis with regard to Ferrante's first claim, albeit with the following addendum. *See id.*

There is nothing of record indicating that the Commonwealth had, in its possession, evidence of Nichols's conviction.[2] Further, Ferrante had equal access to information regarding Nichols's conviction of misbranding, and could have uncovered such conviction with due diligence. *See id.* However,

---

[2] Evidence of unrelated civil settlements generally would not be admissible. *See **Commonwealth v. Sherwood**, 982 A.2d 483, 497 (Pa. 2009) (recognizing that "evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity.").

more fundamental to Ferrante's claim, even if the Commonwealth were under a duty to discover and disclose the conviction of Nichols, we cannot conclude that the information was "material," as Ferrante had suffered no prejudice from the Commonwealth's non-disclosure.

Nichols previously had pled guilty to misbranding a Chemiluminescence Intact Parathyroid Hormone Immunoassay ("PHI"), which is used to test parathyroid hormone ("PTH") levels in patients. ***See*** U.S.F.D.A. "Quest Diagnostics Incorporated To Pay $302 Million to Resolve Allegations that a Subsidiary Sold Misbranded Test Kits." (available at: https://www.fda.gov/ICECI/CriminalInvestigations/ucm261942.htm, (12/15/17). "The PTH tests at issue … were widely used by medical practitioners to determine if patients suffering from conditions such as End Stage Renal Disease were also suffering from hyperparathyroidism, a condition which involves the overactivity of the parathyroid glands and the release of excessive amounts of PTH." ***Id.*** As alleged in the criminal information against Nichols, there were periods of time in which the Advantage Intact PTH Assay provided elevated results, yet Nichols improperly represented that its results were similar to another test. ***Id.***

The Quest technicians testifying in this case did not use the Advantage Intact PTH Assay to determine the levels of cyanide in Dr. Klein's blood. Thus, we cannot conclude that Nichols's misbranding conviction, a conviction involving a different testing procedure for a different substance, was

"material." Similarly, even if such evidence was admissible, we would conclude that Ferrante suffered no prejudice resulting from the alleged non-disclosure, as the evidence was not "material." Consequently, Ferrante is not entitled to relief on this claim.

For the above-stated reasons, we additionally deny Ferrante's Application for a remand to explore whether the Commonwealth was aware of Nichols's conviction.

Ferrante next claims that the evidence was not sufficient to sustain his conviction of first-degree murder. Brief for Appellant at 25, 26. Ferrante argues that the Commonwealth's case "rested solely on circumstantial evidence," and that the Commonwealth failed to prove that he had caused Dr. Klein's death. *Id.* at 25. In support, Ferrante directs our attention to the following evidence, presented at trial.

Ferrante asserts that although the Center for Disease Control and Prevention states that cyanide poisoning "produced symptoms within seconds to minutes; death may occur within minutes[,]" and that such symptoms include nausea, vomiting, abdominal pain and irritation of the lining of the esophagus and stomach, were not observed by the first responders or the staff at the emergency room. *Id.* at 26. Ferrante points to testimony that the symptoms presented by Dr. Klein were inconsistent with cyanide poisoning. *Id.* at 27. Ferrante additionally refers to the testimony of Cyril Wecht, M.D. ("Dr. Wecht"), who opined that Dr. Klein's

"cause of death was undetermined, but could lead to a conclusion of cardiac dysrhythmia." *Id.* Ferrante posits that the evidence does not exclude other hypotheses consistent with his innocence, and that Dr. Klein could have died from cardiac dysrhythmia. *Id.*

Ferrante also asserts that there were conflicts in the Commonwealth's evidence as to the level of cyanide found in Dr. Klein's blood. *Id.* at 28. Specifically, Ferrante contends that the Commonwealth "ignored the NMS [Labs ("NMS")] results in favor of a single result from an unaccredited, non-forensic laboratory with a history and reputation for dishonesty." *Id.* Ferrante points out the discrepancies in the cyanide level reported by Quest, and the level indicated in a second test performed by NMS. *Id.* at 28-29. In addition, Ferrante relies on evidence that Dr. Klein's organs were accepted for transplantation to living people, as no cyanide was detected by the Center for Organ Recovery & Education ("CORE"). *Id.* at 28. According to Ferrante, "[a] conviction based on conjecture, especially here[,] when scientific evidence and technology was available to prove guilt/innocence to a certainty, cannot stand." *Id.* at 29.

Finally, Ferrante directs our attention to the testimony of Quest lab technician Sonia Obscemea, who stated that Quest's test could have produced a false positive result. *Id.* Ferrante also argues that the trial court should have considered the known or potential rate of error. *Id.*

The standard we apply in reviewing the sufficiency of the evidence is whether,

> viewing all the evidence admitted at trial the in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced[,] is free to believe all, part or none of the evidence.

*Commonwealth v. Talbert*, 129 A.3d 536, 542-43 (Pa. Super. 2015) (citation omitted).

In its Opinion, the trial court set forth a comprehensive summary of the evidence presented at trial, viewed in a light most favorable to the Commonwealth, as verdict winner. *See* Trial Court Opinion, 9/15/13, at 4-23. The trial court addressed Ferrante's challenge to the sufficiency of the evidence, in its Opinion, and concluded that the claim lacks merit. *Id.* at 40. We agree with the sound reasoning of the trial court, as set forth in its Opinion, and affirm on this basis with regard to Ferrante's second claim. *See id.* at 4-23, 44.

In his third claim, Ferrante argues that the verdict is against the weight of the evidence. Brief for Appellant at 30, 39. In support, Ferrante points out that Quest is not an accredited forensic laboratory and that forensic laboratories are subject to stringent requirements. *Id.* at 30-31. In addition, Ferrante asserts that Quest did not follow its own standard operating procedures, when it failed to repeat the cyanide test; its control test was not negative for cyanide; and the lab technician failed to run a dilution control. *Id.* at 31-32. According to Ferrante, Obcemea, the lab technician, "could not remember how many spectrophotometers she used at that time or which machine she used on Klein's blood sample." *Id.* at 33. Further, Ferrante asserts that Obcemea could not remember whether the spectrophotometer that she used to test Dr. Klein's sample was the one taken out for repairs a week later. *Id.* Ferrante also points out that Dr. Klein's blood cyanide level was amended three times by different Quest personnel, and that a false positive can result from the method used by Quest to test the sample. *Id.* at 34-35. Ferrante directs our attention to other purported errors by Obcemea, and violations of Quest's standard operating procedures. *Id.* at 35-39.

In order to preserve a challenge to the verdict as against the weight of the evidence, "the issue must be raised with the trial judge in a motion for a new trial either orally prior to sentencing, by written motion prior to sentencing, or in a post-sentence motion." *Commonwealth v. Lewis*, 45

A.3d 405, 410 (Pa. Super. 2012) (*en banc*). As our Supreme Court has explained,

> [t]he decision to grant or deny a motion for a new trial based upon a claim that the verdict is against the weight of the evidence is within the sound discretion of the trial court. Thus, the function of an appellate court on appeal is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence. An appellate court may not overturn the trial court's decision unless the trial court palpably abused its discretion in ruling on the weight claim. Further, in reviewing a challenge to the weight of the evidence, a verdict will be overturned only if it is so contrary to the evidence as to shock one's sense of justice.

**Commonwealth v. Cash**, 137 A.3d 1262, 1270 (Pa. 2016).

In his post-sentence Motions filed on February 17, 2015, Ferrante challenged the weight of the evidence based upon the following assertions:

> The verdict was also against the weight of the evidence. As stated above, the Commonwealth's toxicology evidence was "so unreliable and/or contradictory as to make any verdict based thereon pure conjecture." **Commonwealth v. Farquharson**, 467 Pa. 50,60, 354 A.2d 545, 550 (1976). The Commonwealth's experts (*i.e.*, the pathologist and the toxicologist) accepted the Quest blood test result (3.4 mg/L or 2.2 mg/L) without reservation. The Pennsylvania Courts have held that if the basis for the expert's opinion is faulty (*i.e.*, reliance on the Quest results here) the opinion is incompetent and entitled to no weight. **See Viener v. Jacobs**, 834 A. 2d 546 (Pa. Super. 2003); **see also Commonwealth v. Sero**, 387 A.2d 63 (Pa. 1978).
>
> On the other hand, the defense experts did not accept this faulty Quest evidence and concluded that a finding of cyanide poisoning could not be made within any reasonable degree of medical certainty, and that the cause of death was consistent with cardiac. Hence, the opinions of the defense experts are entitled to greater weight. Accordingly, [Ferrante] is entitled to, at a minimum, a new trial.

Post-Sentence Motions, 2/17/15, at 7. In his Supplemental Post-Sentence Motions, Ferrante raised no further challenge to the verdict as against the weight of the evidence.

As set forth above, Ferrante did not challenge the verdict as against the weight of the evidence, based upon Quest's purported violation(s) of its standard operating procedures. The trial court did not address these contentions in its Opinion. "[A] challenge to the weight of the evidence must first be raised in the trial court and failure to do so [will constitute] a waiver of the claim." *Commonwealth v. Widmer*, 689 A.2d 211, 212 (Pa. 1997). Because Ferrante failed to preserve this challenge to the weight of the evidence before the trial court, in his post-sentence Motions, we conclude that it is not preserved for our review.[3] *See Cash*, 137 A.3d 1270; *see also* Pa.R.A.P. 302(a) (stating that a claim cannot be raised for the first time on appeal).

In his fourth claim, Ferrante claims that the trial court erred in denying the following suppression Motions: Numbers 1, 20, 24, 28, 38, 60, 63 and 64. Brief for Appellant at 39. Ferrante argues that by denying these Motions, the suppression court improperly permitted "fruits of the Commonwealth's illegal searches and seizures to be introduced against [Ferrante] at trial." *Id.* (capitalization omitted). Specifically, Ferrante

---

[3] To the extent that Ferrante generally challenges the verdict as against the weight of the evidence, we affirm on the basis of the trial court's Opinion with regard to Ferrante's claim. *See* Trial Court Opinion, 9/15/16, at 44.

- 13 -

argues that the Quest blood test results are "prone to error and are entitled to no weight[;]" "the search warrants were issued based upon the Commonwealth's misstatements relative to the Quest tests[;] and the evidence seized pursuant to those warrants must be suppressed." *Id.*

Ferrante first argues that the items seized pursuant to the search warrant for Ferrante's vehicle should have been suppressed. *Id.* at 40. In this regard, Ferrante states that the search warrant sought evidence of "cyanide and any and all items that are capable of storing, transporting or delivering cyanide." *Id.* (capitalization omitted). Ferrante challenges the seizure of his computer, a Lexar "jump drive," and a USB storage device from the trunk of his car. *Id.* According to Ferrante, because this initial seizure was unlawful, evidence seized from these items, pursuant to subsequent warrants, are fruits of the poisonous tree, and should be suppressed. *Id.* at 41.

In its Opinion, the trial court addressed Ferrante's challenge to the seizures resulting from the vehicle search, and concluded that the challenge lacks merit. *See* Trial Court Opinion, 9/15/13, at 24-32. We agree with the sound reasoning of the trial court, as set forth in its Opinion, and affirm on this basis as to Ferrante's challenge to the items seized from his vehicle. *See id.*

Ferrante next challenges the search warrants seeking computers, laptops and other electronic devices. Brief for Appellant at 41. Ferrante

argues that there is no information, in the affidavits of probable cause, indicating why evidence of a crime may be found in these computers or devices. *Id.* Ferrante contends that the initial search warrants sought "[a]ny and all computers or laptops that may contain [c]yanide information." *Id.* at 42. Ferrante asserts that the warrants were overbroad, and "permitted an illegal rummaging through [Ferrante's] computers in search of incriminating evidence." *Id.*

In its Opinion, the trial court addressed these contentions and concluded that they lack merit. *See* Trial Court Opinion, 9/15/13, at 32-37. We agree with the sound reasoning of the trial court, as set forth in its Opinion, and affirm on this basis with regard to Ferrante's assertions. *See id.*

In his fourth claim, Ferrante also argues that the evidence seized should be suppressed because the search warrants were not stored in the Allegheny County Department of Court Records. Brief for Appellant at 43. Ferrante contends that law enforcement officials violated Pa.R.Crim.P. 210 (Return of Papers to Clerk) by not maintaining and preserving these records. Brief for Appellant at 43.

Our review of the record discloses that Ferrante did not raise this claim in his Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal. Accordingly, it is waived. *See Commonwealth v. Castillo*, 888 A.2d 775, 780 (Pa. 2005) (stating that "[a]ny issues not raised in a

Pa.R.A.P. 1925(b) statement will be deemed waived."); **see also Commonwealth v. Mason**, 130 A.3d 601, 635-36 (Pa. 2015) (stating that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

Finally, we address an Application for Relief, filed by Ferrante. In his Application, Ferrante asks this court to remand the case for an evidentiary hearing. Application for Relief, 10/20/17. Ferrante contends that at an evidentiary hearing, he would present evidence related to the testing of Dr. Klein's liver, prior to the transplant of that organ. **Id.** Ferrante directs our attention to testimony, by Dr. Wecht and another expert, that cyanide is not limited to blood, but is deposited in organs and tissues throughout the body. **Id.** at 4.

Pennsylvania Rule of Criminal Procedure 720(c) provides that "[a] post-sentence motion for a new trial on the ground of after-discovered evidence must be filed in writing promptly after such discovery." Pa.R.Crim.P. 720(c).

Our review of the record discloses that the evidence related to Dr. Klein's transplanted organ is not "newly discovered," but cumulative to other evidence presented at trial. During opening arguments, defense counsel informed the jury that

> [t]he samples and the blood that [were] sent to CORE, the transplant people, [tested] negative, negative for cyanide. The organs, there is a liver and a healthy kidney in two people as we talk. Dr. Martin thought it was so critical when he heard about

- 16 -

> the cyanide level of 3.4, he frantically called CORE to hold off on the transplantation. Where do we clean our blood from? Our liver and kidneys. Well, they are in two healthy people for all we know because there was successful transplantation and the blood testing was negative.

N.T. (Vol. I), 11/4-7/13, at 66. Dr. Wecht also testified regarding two tests performed by CORE on body tissues from Dr. Klein. N.T. (Vol. IV), 11/4-7/13, at 163. Dr. Wecht stated that the two tests on Dr. Klein's tissues came back "negative." *Id.*

Contrary to Ferrante's assertion, the letter from a transplant recipient, regarding the condition of his/her organ, is merely cumulative of the results of the CORE test. As such, we decline Ferrante's request for a remand on this issue.

Ferrante's Application further alleges a claim of ineffective assistance of counsel. Absent extraordinary circumstances, which do not exist here, "claims of ineffective assistance of counsel are to be deferred to PCRA review; trial courts should not entertain claims of ineffectiveness upon post-verdict motions; and such claims should not be reviewed upon direct appeal." ***Commonwealth v. Holmes***, 79 A.3d 562, 576 (Pa. 2013). We decline to remand the matter for a hearing, without prejudice to Ferrante's right to raise this claim in a timely filed petition under the Post Conviction Relief Act.[4]

---

[4] ***See*** 42 Pa.C.S.A. §§ 9541-9546.

Motion to file exhibit under seal granted; Applications for Relief Denied; Judgment of Sentence Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/18/2018

IN THE COURT OF COMMON PLEAS FIFTH JUDICIAL DISTRICT
ALLEGHENY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,

v.

ROBERT FERRANTE,

Defendant.

CRIMINAL DIVISION

CC No.: 2013013724

OPINION

Honorable Jeffrey A.
Manning, P.J.
Court of Common Pleas
Room 325 Courthouse
436 Grant Street
Pittsburgh, PA 15219

Counsel of Record:

For the Defendant:

Christopher Eyster, Esq.
110 Ross Street, Suite 340
Pittsburgh, PA 15219

For the Commonwealth:

Lisa Marie Pellegrini, Esq.
Assistant District Attorney
Allegheny County DA's Office
303 Courthouse
436 Grant Street
Pittsburgh, PA 15219

1

IN THE COURT OF COMMON PLEAS FIFTH JUDICIAL DISTRICT
ALLEGHENY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,    CRIMINAL DIVISION

v.    CC No.: 2013013724

ROBERT FERRANTE

Defendant.

## **OPINION**

Manning, J.

The defendant was charged by criminal information with one count of Criminal Homicide arising out of the poisoning death of his wife, Autumn Klein. The defendant filed an Omnibus Pre-Trial Motion that included 89 separate motions seeking to suppress evidence. Following a hearing on 10/20/14, the defendant's Motions were denied. He then proceeded to a jury trial which commenced on October 23, 2014, and concluded on November 7, 2014, with the jury returning a verdict of guilty of Murder of the First Degree. Post Sentence Motions were filed and denied. A timely Notice of Appeal was filed and the defendant, pursuant to this Court's Order, filed a Concise Statement of Matters Complained of on Appeal. This Court then ordered an Amended Concise Statement filed because the defendant's original Concise Statement averred that he was challenging the Court's denial of his Pre-Trial Motion. Because that Pre-Trial Motion challenged

2

the denial of the Pre-Trial Motion. As that motion included 89 distinct suppression motions, many of which were withdrawn by the defendant and/or were conceded by the Commonwealth, the defendant was ordered to specify which of those motions are being challenged on appeal. His Amended Concise Statement of Matters Complained of on Appeal provided that specificity.

The defendant raised, in his Concise Statement and Amended Concise Statement, the following claims:

1. The Court erred in entering several Orders prior to the trial concerning custody of the parties' minor child, Cianna Ferrante;

2. The Court erred in denying the Suppression Motions numbered 1, 20, 21, 28, 38, 60, 63 and 64, that were set forth in the defendant's Omnibus Pre-Trial Motion;

3. The Court erred in its rulings on the defendant's Post Sentence Motions concerning the allegation that the Commonwealth committed a Brady violation by failing to disclose a criminal conviction of Nicholas Institute Diagnostics;

4. The Court erred in denying the Motion for Judgment of Acquittal based on the insufficiency of the evidence;

5. The Court erred in denying the Motion for a new trial because the verdict was against the weight of the evidence; and

6. The Court violated Pennsylvania Rule of Criminal Procedure 581(i) in failing to issue written findings of fact and conclusions of law regarding the denial of the defendant's suppression motions.

3

Before turning to the legal issues, it is important to review the facts established by the evidence, keeping in mind that those facts must be construed in favor of the Commonwealth as the verdict winner. The Commonwealth's evidence established that victim, Dr. Autumn Klein, was seen leaving Presbyterian University Hospital at approximately 11:18 p.m. (I, 90[1]) At approximately 11:52 p.m. on that same date, the defendant telephoned 911 requesting an ambulance as his wife had collapsed. (I, 76-77)

A Pittsburgh City Paramedic, Jerad Albaugh, responded with his partner, Steve Mason. They entered the house and found Dr. Klein lying on the kitchen floor, unconscious. She was breathing and had a pulse, but her blood pressure was low. When he asked the defendant what happened, he said that he was upstairs with his daughter and., and when he came down, found his wife lying on the floor. (I, 114-116)

Paramedic Albaugh indicated that the victim's condition began to worsen; she remained non-responsive and her heart rate, breathing and blood pressure worsened. He realized that they had to transport her immediately. As he was treating Dr. Klein, he heard his partner ask the defendant about a ziplock bag with a white substance in it that was sitting on the counter. The defendant said that his wife was trying

---

[1] The designation "I, 90", refers to the volume of the transcripts and the page number.

4

to get pregnant and was taking fertility drugs as well as creatine as a supplement to help her get pregnant. They then transported Dr. Klein to Presbyterian Hospital as it was only a block and half away. (I, 121)

At the hospital, Dr. Klein came under the care of Andrew Farkas, M.D., an emergency room resident. She was non-responsive and a check of her vital signs indicated that she was extremely ill. (I, 130) He began an IV line and intubated her to allow her to use a ventilator to assist in her breathing. (I, 132) When the defendant arrived, he told Dr. Farkas that his wife had no health problems other than low thyroid. When asked if she suffered from headaches, he told them that she told him immediately prior to her collapse that she was not feeling well and had a headache. He further related that she has had some fainting episodes in the weeks or months prior to her collapse. (I, 133-134) Dr. Farkas also noticed, when placing a central line, that her blood was bright red. He said that this is a sign that she had a lot of acid in her blood which was a sign of a severe metabolic dysfunction. (I, 143) Dr. Klein was eventually transferred to the Intensive Care Unit and Dr. Farkas was no longer involved in her care.

Three days later he spoke with Thomas Martin, M.D., the supervising physician in the ER, who advised him that the test results from the blood taken from Dr. Klein were back and indicated the presence of a high level of cyanide. (I, 149). Dr. Farkas became

5

concerned and contacted the Allegheny County Medical Examiner's office and advised them of these results.

Dr. Martin was on duty when the victim was brought in. He examined Dr. Klein and concluded that she was critically ill. (I, 163). While supervising her treatment, he spoke with the defendant, who told him:

> ...that his wife had worked until late in the evening and had come home and that shortly after arriving home she had complained of a headache and grabbed her head, assumed somewhat of a squatting position, and then had collapsed. He told me that over the preceding weeks preceding this presentation Dr. Klein had had two what he characterized as more minor episodes where she complained of light-headedness. I believe one of them was while she was at church. He told me that she was somewhat resistant to having these looked into. They had informally consulted a physician friend who I think provided some assurance but it didn't sound like she had had any major investigation into these episodes.

(I, 166). The defendant added that she had been taking some vitamins and had been on fertility drugs until February.

Dr. Martin testified that while he was treating Dr. Klein her heart stopped twice and she had to be resuscitated. Eventually, she was placed on extracorporeal membrane oxygenation (ECMO), which assists the heart. Though this stabilized Dr. Klein, she remained critically ill. (I, 184-187). She was transferred to the cardio-thoracic intensive care unit and was no longer under Dr. Martin's direct care. He later learned that she had died on April 20, 2013.

6

Dr. Jon Rittenberger was part of the post-cardiac arrest team which follows patients who had suffered cardiac arrest. When he first encountered her, she was critically ill and "...appeared neurologically devastated." (I, 216). In addition to examining her, he reviewed the records from her ER treatment and was struck by the fact she was recalcitrant to everything that was tried to restore her cardiac and pulmonary function, which was unusual in a young, healthy person. (I, 221). Because her symptoms and presentation were consistent with cyanide poisoning, he ordered a test to determine the cyanide level in her blood. (I, 225). Blood for that test was drawn on April 18 at 2:32 p.m. to be sent to Quest Diagnostics for testing.

Throughout April 18 and 19, though the functioning of her other organs seemed to slowly improve, Dr. Klein's condition remained "grave", according to Dr. Rittenberger. On April 18 he conducted a brain death test, the results of which indicated that Dr. Klein had suffered brain death. (I, 228). A second such test on the 19th was consistent with the first one.

Between the first and second brain death tests, after advising the defendant of the results of the first brain test, Dr. Rittenberger discussed the possibility of an autopsy with the defendant. He explained that it was initially believed that Dr. Klein may have suffered from episodes of passing out and that such incidents can be caused by

a rhythm disturbance to the heart which can be genetic. Because she had a daughter who might inherit the gene causing this disturbance, he suggested an autopsy to explore possibility. Dr. Ferrrante did not agree and would not agree to an autopsy. (I. 230)

Dr. Rittenberger also testified that when he ordered the test for cyanide levels on April 18, he told only Dr. Callaway, who was assisting her caring for the victim and the nurse who drew the blood. (I, 239). He did not discuss it with the defendant or the victim's parents or other family members. He did not learn of the test results until Dr. Farkas called him on April 23, three days after Dr. Klein's death on April 20. (I, 232).

Former Pennsylvania State Trooper Scott Lucas testified regarding assistance he provided to the Pittsburgh Police in accessing various electronic devices seized in this matter pursuant to search warrants. (I, 479) He related an exchange of messages between the I-Phone belonging to Dr. Klein and her husband, the defendant, that took place on April 17, 2013. The gist of those messages were that Dr. Klein was advising the defendant that she was ovulating and he was reminding or encouraging her to take creatine to assist in her fertility. (I,. 488-490).

The defendant was interviewed by detective James McGee on April 25, 2013, two days after it had been determined that Dr. Klein

had died from cyanide poisoning and an investigation opened into her death. The defendant stated that his wife had ceased fertility treatment earlier that year but that he had put her on a creatine regimen that he said might help her get pregnant. (I, 426) He said that his wife seemed happy. On the night of April 17, according to the defendant, his wife came home around 11:00, kissed him on the cheek, said she did not feel well and collapsed to the floor. (I, 428) He called 911 and attempted to perform CPR while waiting for the ambulance. When asked if he had creatine in the home, he showed the detective two ziplock bags that contained creatine and allowed them to take the bags. (I, 430) Det. McGee asked the defendant if he knew how his wife died and he said he thought it was a heart attack or a brain condition. When he advised the defendant that his wife died from cyanide poisoning, "...he looked at his daughter and said why would she do this to herself and then he looked back at me and said who would have done this to her." (I, 436-437)

On May 2, 2013 police searched the lab area used by Dr. Ferrante and others. On the side of the lab used by a Dr. Friedlander, a 125 gram bottle of potassium cyanide was located. A search of Dr. Ferrante's area of the lab resulted in the seizure of a 500 gram bottle of potassium ferricyanide. (I, 459-460) Law enforcement returned to the lab again on May 3, 2013 and were directed to a refrigerator on

the defendant's side of the lab where a 250 milligram bottle of potassium cyanide was located. The seal on the bottle was broken. (I, 461-463)

Michelle Perpetua was the manager for the lab where Dr. Ferrante worked. (I, 532) Her duties include ordering supplies or materials needed by the doctors. (I, 534) The requests for supplies always came to her through the defendant's assistants; never through him. On April 15, 2013, however, he came to Ms. Perpetua and asked her to order potassium cyanide for him. She did so and it was delivered the next day. (I, 540-545) After hearing in the media that the victim died from cyanide poisoning, she reported this purchase to her superior. (I, 547)

Amanda Mihalik, a research assistant for the defendant, testified that a day or so before Dr. Klein collapsed, the defendant asked her to transfer some creatine to a ziplock bag which he said he was going to give to his wife. (II, 85) She also observed the defendant mixing things in beakers, in the lab, and drinking it. She thought this odd because they were not supposed to take any food or drink into the lab because of the dangerous chemicals present. (II, 8) The defendant's chief research assistant, Jinho Kim, testified that he has worked for the defendant since December 2007. He had never used, or saw the defendant use, cyanide in any research. (II, 104-107)

On April 16, 2013, Dr. Ferrante came to him and handed him a plastic bottle containing cyanide. He did not explain to him at that time what the cyanide was for when he handed it to him, but came back a few minutes later and explained that he planned to use the cyanide for future experiments. Dr. Kim asked if he should put the cyanide in a locked cabinet, but the defendant said that was not necessary so he stored it under his work bench. (II, 109) He did not see the cyanide again until after Dr. Klein died, when detectives came to the lab looking for cyanide and he found it in the refrigerator. He had not moved it from under his bench. (II, 110)

Pennsylvania State Trooper John Roche testified regarding a search he conducted of the data copied from the hard drive of a silver MacBook Pro, serial number C02CM349DC7C. These searches were conducted using search terms to try to detect what terms may have been searched on internet search engines on that computer. (II, 162-164) This search revealed that, on January 31, 2013, at various times throughout the day, the following terms were searched for on the Google search engine: "Cyanide poisoning"; " Human Toxicity 3-Nitropropionic Acid"; "Toxicity 3-Nitroproprionic Acid Cardiomyopathy"; and " Toxic Dose Human 3-Nitroproprionic Acid Cardiomyopathy". (II, 167-168. On February 18 "Divorce in Pa" was searched. On February 19, the term " Does Increased Vaginal Size Suggest Wife is Having Sex

11

with Another" was searched. (II, 169). Additional Google searches were conducted for "Creatine IVF" on March 3 and for "This is What a Heart Attack Feels Like to a Woman Billboard" on March 15; fro

On April 14 the term "Potassium Cyanide Neuroscience Project" was searched as was "Potassium Cyanide Sigma". (II, 170-171)  On April 22 and 23, 2013, the following Google searches were conducted: " "medical examiner toxicology report"; "Toxicology Studies Potassium Cyanide"; " Detecting Cyanide Poisoning"; " Potassium Cyanide Detection Blood Urine"; "Dialysis and Removal of Toxins"; "Cardiopulmonary Failure Metabolic Acidosis Causes"; and " Causes Sudden Death Acute Cardiopulmonary Failure Metabolic Acidosis Causes". (II, 172-174). The searches on the 23rd were made prior to the defendant meeting with the detectives and being advised that his wife had died of cyanide poisoning.

Trooper Roche testified that "Safari" is another internet search engine that was accessed to search a variety of terms on this computer. His review of the hard drive revealed that the following web addresses were accessed on January 8, 2013: "Cyanide Poisoning Causes, Symptoms, Treatments, Went to Seek Medical Care:" on MedicineHealth.com, "Cyanide Poisoning Causes, Symptoms, Treatment, Cyanide Poisoning Causes" on MedicineHealth.com ", "Cyanide Poisoning, Causes, Symptoms, Diagnosis and Treatment" on

12

MedicineHealth.com ",  "Illinois Man Killed By Cyanide Poisoning After Striking It Rich In Lottery" at CNN.com and "Cyanide Poisoning" at Wikipedia The Free Encyclopedia.  (II, 175-178)  On April 14, 2013 the web address "http://www.sigma-aldrich.com/catalog/display/msdscontent.do" was accessed.  On April 22, 2013, "Toxicology Reporting" at the Miami Dade County Medical Examiner Toxicology website, ""Cyanide Poison Hard to Detect" at CNN.com, " Emergency Response Safety and Health Database Systemic Agent Potassium Cyanide NIOSH" at the CDC website, " How Would a Coroner Detect When Someone is Killed by Cyanide" from an article from Yahoo.com, "How Can You Detect Potassium Cyanide", "How Would You Test for Potassium Cyanide",  "The Facts About Cyanide" were searched for on April 22, 2013. (II, 175-181).

Sonia Obcemea testified that she is a medical technician at Quest Laboratories.  She has a degree in chemistry and has worked at Quest for 37 years.  She has conducted more than a thousand tests on blood for the presence of cyanide.  (II, 291, 294)  She was assigned to test the sample of Autumn Klein's blood sent by Presbyterian Hospital.  She tested it on April 20, 2013. (II, 295)  Initially, she observed that the blood was a very deep color red, which indicated to her that it was likely to contain a high level of cyanide.  (II, 299)  Her

13

testing revealed that the amount of cyanide was 2.2 milligrams per liter, a "...very, very high" result. (II, 303)

Ryan Bartolotti, was a group leader at Quest. Part of his job was to review the results of others on his team, including those of Ms. Obcemea. He was tasked with checking the results reached by Ms. Obcemea. (II, 355) He testified that in doing so, he made an error that led to a higher reading, 3.4 milligrams per liter. He described his error:

>...It's set up where the Y axis here is the absorbance value and the X axis here is the concentration of cyanide given that absorbance value following on this line. Where I made the error when I did the checking of Sonia's work was I confused the axises.
>
>Q. Why did you do that?
>
>A. I don't honestly know. So what I did then is instead of plotting the absorbance on the Y axis to get the concentration on the X axis, I plotted the absorbance on the X axis to then get the concentration on the Y axis giving me that higher value.
>
>Q. Now, you then came up with -
>
>A. It was a value of .67.
>
>Q. Okay. And that .67, you had to multiply -
>
>A. By the dilution factor.
>
>Q. So we'll just use this chart over here because it's easier. So you came up -- you -
>
>ATTORNEY PELLEGRINI: May he step down? May he step down?

14

THE COURT: Yes.

Q. Just make sure the jury -- just describe to the jury what you did.

A. So initially, like I said, this was not here, this is the writing that I put in after I was -- after I was done reviewing the work. So the absorbance stays the same. There was no changing of any -- there's no additional work done with the sample. I used the data that Sonia generated. So on that plot that's shown up there, when I plotted .54 on the X axis and drew up to our line and then over to the Y axis to get the concentration which was incorrect, I got this .67 value, and because she had done the sample on a time slide solution, which I'm sure she already described, I multiplied that times the concentration to get the 3.35 value for the concentration of cyanide in that patient's sample.

Q. So then I'll show you what I've marked, using those calculations, did you then generate a final report?

A. Yeah, I entered the value into our lab information system and then released it to our client, and because we round to one decimal place, it went out as 3.4 to the client.

(II, 355-357)  He said that the data that resulted from the testing was correct, but that he applied that data incorrectly to reach the higher result that was forwarded to the hospital.  After discovering the error, he did not retest because either level was a lethal amount. (II, 359)

Quest clinical technology supervisor Michael Browne testified that, in response to a search warrant, he retrieved the "run", or paperwork, from the testing performed on the victim's blood sample. (II, 391)  When he reviewed the run, he noted that there was a discrepancy in the results.  The discrepancy was the result of a

15

calculation error by Mr. Bartolotti. (II, 396) Browne took this information to his supervisor, Dr. Edinboro, who instructed him to issue an amended report with the correct result. (II, 397) This amended report had the same value originally obtained by Ms. Obcamea. (II, 398)

Allegheny County Medical Examiner Toxicologist Alesia Smith testified that she conducted a test on a blood sample from the victim. She described the testing process at length, explaining that her process does not result in a specific number result, but only a positive (for the presence of cyanide) or a negative (if there is no cyanide present). (II, 435-446) She tested a sample of whole blood collected from the victim on 4/18/13 at 6:00 a.m. (II, 448) The blood tested positive for the presence of cyanide. (III, 8) A fellow toxicologist, Rafael Gelpi, testified that he tested a blood plasma sample drawn from the victim on April 18 at 8:00 a.m. (III, 31) He described the results:

> The results were very remarkable. I tested the plasma as you can see. This right here, yellow is a reaction to plasma in comparison with red blood cells. I have been doing this test for 23 years. This is the first time that I ever seen a plasma react. It gives me indication that there has to be a lot of cyanide in there. You do see cyanide on plasma in low concentrations but there has to be a lot in whole blood.

3 (II, 3)

16

Nancy Love, employed in the trace section of the Medical Examiner's Office, testified that she was asked to determine the volume of three containers of cyanide. Commonwealth Exhibit 170, Laboratory item 40-A, was a bottle labeled to contain 500 grams of Sigma potassium ferricyanide. It contained 313 grams. 86. Commonwealth Exhibit 171, Laboratory Item 40-b was a Sigma potassium cyanide bottle labeled to contain 25 grams. It was found to contain 24.868 grams on one weighing and 25.158 grams on another. (III, 86-87) Commonwealth exhibit 172, laboratory item 41, was a container of Sigma Potassium Cyanide labeled to contain 250 grams and found to contain 241.7 grams when initially weighed and 241.6 grams after an amount was removed for testing. (III, 87-88; 90-91) Environmental chemist Olexa then testified that the substance within each of the bottles tested was, in fact, cyanide. Potassium ferricyanide in laboratory item 40-A and potassium cyanide in 40-B and 41. (III, 115-116)

Todd Lukasevic, Associate Medical Examiner for Allegheny County, testified as to the cause of death of the victim. He performed the autopsy on Dr. Klein on April 21, 2013. The autopsy revealed no obvious cause of death. (III, 289) After preserving the brain and tissue from the heart for further testing, the body was released to the family. The death certificate stated that the cause was "pending

17

toxicology result, neuro-pathologist consultation and cardiac pathologist consultation..." He then was notified by Dr. Farkas of the determination by Quest that there was lethal dose of cyanide in the victim's blood. (III, 292) He immediately called the funeral home to which the body was released and learned that she had been cremated. As the investigation into the cause of death continued, Dr. Lukasevic reviewed a report from the cardiac pathologist to whom he had sent the cardiac tissue. She reported that there was no evidence of disease of the heart that could have caused death. (III, 295) The neuropathologist who examined the brain reported the final diagnosis as "global ischemic encephalopathy.", which Dr. Lukasevic described as the brain being dead from lack of blood and oxygen. (III, 296) This finding was "...a very significant finding and consistent with a toxic ingestion of cyanide", according to Dr. Lukasevic. (II, 296) He stated that he believed that Dr. Klein died from cyanide poisoning. In offering that opinion, he considered all of the blood test results. He said that it did not matter if the quantitative results were 2.2 or 3.4, the correct and erroneous results reported by Quest. The manner of death, he concluded, was homicide. He held these opinions to a reasonable degree of medical certainty. (III, 300)

His opinion that cyanide was the cause of death was corroborated by Christopher Holstage, M.D., a faculty member at the

18

Medical College of Virginia. Dr. Holstage is also a fellow in medical toxicology. He reviewed the medical records of the treatment of Dr. Klein, as well as the toxicology results, and concluded, within a reasonable degree of medical certainty, that her cause of death was cyanide poisoning. (III, 347-410)

The defendant presented Robert Alan Middleberg, a forensic toxicologist at NMS laboratories. He testified that his lab was asked to conduct toxicology tests on two blood samples taken from the victim. The sample they tested, according to the witness, was drawn at 3:31 p.m. on April 18, 2013. (III, 465 & 526). Testing of that sample revealed a level of between .3 and .5 micrograms per milliliter. (III 464) He did not believe that Dr. Klein had "clear cyanide findings in her. " (III, 490) He testified that he could not state, with certainty, what role, if any, cyanide played in the death of the victim. (IIII, 492).

Dr. Middleberg reviewed the police reports of the interviews of Drs. Martin, Farkas, Calloway, Sappington, Pizon, Guyette and Rittenberger. (III, 496). He also reviewed the criminal complaint. He did not, however, review any other police reports or interviews or the victim's medical records. (III 497) He acknowledged that he was not aware that the victim had undergone dialysis prior to writing his report and that that could affect the test levels. (III, 499)

The defendant presented Lewis Nelson, M.D., Vice Chair of the Department of Emergency medicine at NYU Hospital and a medical toxicologist. He testified out of order and was videotaped and the video played during the defendant's case. His testimony appears in Volume III of the transcripts, pp. 162 - 212. He stated that, in his opinion, based on the medical records he reviewed, it could not be stated with certainty that Autumn Klein died from cyanide poisoning. (III, 165-167. He acknowledged that her symptoms and condition upon admission and through the course of treatment to her death was consistent with cyanide poisoning, but believed that that were there too many inconsistencies for him to be certain that cyanide poisoning was the cause of death. (III, 185)

The defense also presented Shaun Carstairs, M.D., an attending ER physician and medical toxicologist. He reviewed the medical records, the criminal complaint, the autopsy results, interviews of various treating physicians and the reports of the other toxicologists and physicians who rendered opinions in this matter. (III, 559). He concluded "... that based upon the records that I had an opportunity to review, I can't -- it's my opinion that it cannot really be definitively stated that Dr. Klein died as a result of cyanide poisoning. (III, 565). He provided several reasons for his opinion. First, he believed that the victim was conscious upon he arrival to the ER. (III, 565). Second,

20

the test result from the two laboratories, Quest and NMS, showed disparities. He said that the initial results from Quest were modified downwards for reason that were not clear to him. (III, 566). He also did not think that any of her symptoms were specific to cyanide poisoning. (III, 566).

Forensic Pathologist, Dr. Cyril H. Wecht, also testified for the defense. He concluded that "...the cause of death in this case is undetermined and hence the manner of death is undetermined." (IV, 161). He explained how he reached that conclusion:

> So you have very significant inconsistencies ranging from a corrected level of 2.2 micrograms per milliliter which could be a factor and 0.3 to 0.5 which is a normal level by two large national laboratories. You have other tests that are significant that is consistent for metabolized thiocyanate that are within normal ranges. You have two tests done by CORE on body tissues which are negative so you've got a mixed bag and that's what leads me at that point and today to the opinion that I've rendered as undetermined.

(IV, 162-163). He also suggested that a long history of ingesting large doses of creatine could lead to false positives for cyanide. (IV, 171).

The defendant's daughter, Kim Ferrante, testified that she told her father, sometime on Saturday, April 20, that a test for the presence of cyanide had been ordered. During her direct testimony, when asked if she was aware of the pending cyanide test, she said, "So, I think that one of the cardiologists or cardio-thoracic surgeons told me--". (IV, 223) Later, when asked by the prosecutor to identify

21

the doctor who told her about the cyanide test, she said, " It wasn't a doctor. I overheard two nurses discussing it at the nurse's station. (IV, 229). She was also present when the possibility of an autopsy being performed was discussed and said that her father did not oppose an autopsy, but wanted to make sure that her organs would be donated. (IV, 225). She was involved in the funeral arrangements and said that it was her understanding that Dr. Klein had expressed a wish to be cremated. (IV, 226).

The defendant also testified. He denied having anything to do with the death of his wife. He explained that the cyanide he ordered was connected with research he was planning to do with stem cells. (IV, 253). His searches in January for terms associated with cyanide were, he claimed, related to this research. (IV, 255). He said that discussions about the autopsy were to make sure that that did not interfere with her desire to donate her organs. (IV, 289). When asked about the internet searches related to toxicology testing for the presence of cyanide or how a medical examiner would detect cyanide, he explained:

> I knew her organs had been donated. It was still unbelievable to me that her organs could be donated if there was cyanide. I knew the ME had done his exam and had not heard back, no results. Typical of myself, when something really bothers me, I just Google and look up everything about it, how it could have happened, why it could have happened, et cetera.

(IV, 291). He claimed that his daughter had told him about the pending cyanide test. (IV, 291) He acknowledged that he was interviewed by representatives of CORE, the Center for Organ Donation and Recovery regarding his donation of his wife's organs after knowing about the pending cyanide test but never discussed that with those representatives. (IV, 323-324)

The first claim raised by the defendant concerns three orders entered regarding the custody Cianna Ferrante, the minor child of the victim and defendant, who was 6 years old when her mother was murdered. On July 24, 2013, pursuant to a Petition for Special Relief filed in the Family Division of this Court at FD 13-003356, the Honorable David Cashman entered an order granting legal and physical custody of Cianna to her maternal grandparents, Lois and Charles Klein. Later, by order dated January 24, 2014, this Court denied a request from the defendant that an order that he have no contact with his daughter be lifted. The Court also noted in that order that the issue of custody was to be addressed in the context of the custody matter which, after Judge Cashman's initial Order was entered pursuant to the Petition for Special Relief, was then assigned to Judge Cathleen Bubash serving in this Court's Family Division. Finally, the Court denied the defendant's February 2, 2015 Motion to Lift No

Contact Order, again noting that questions pertaining to custody were to be presented to Judge Bubash.

This Court did not enter a final Order regarding custody. The defendant's requests that this Court address custody matters were referred to Judge Bubash. It is this Court's understanding that there were additional proceedings before Judge Bubash that resulted in the entry of a final custody order and that the defendant is pursuing an appeal of that order before the Superior Court at 1923 WDA 2015. As no final order was entered and the defendant is currently litigating custody in the Superior Court, this claim is without merit.

The defendant challenges this Court's denial of 8[2] of the 80 separate Suppression Motions that were included in his Omnibus Pre-Trial Motion. The defendant challenged the sufficiency of the Affidavits of Probable Cause and/or the scope of the warrant in the following Motions: 1st[3], 20th[4], 21st[5], 28th[6] and 60th[7]. As they involve the same legal principles, they will be addressed together.

Pa. R. Crim. P. 503 provides in pertinent part:

(B) No search warrant shall issue but upon probable

---

[2] Those are the motions numbered 1, 20, 21, 28, 38, 60, 63 and 64.
[3] Search warrant No. 2244-2013, executed May 3, 2013 authorizing search of 2013 Hyundai motor vehicle.
[4] Search warrant No. 2689-2013, executed May 29, 2013 authorizing search of Apple Macbook Air computer.
[5] Search warrant No. 2690-2013, executed May 29, 2013, authorizing search of Apple Macbook Air computer.
[6] Search warrant No. 2697-2013, executed May 29, 20123 authorizing search of a 4 GB Lexas Flash Drive.
[7] Search warrant No. 6526-2013, executed December 23, 2013, authorizing search of Macbook Air laptop computer.

cause supported by one or more affidavits sworn to before the issuing authority in person or using advanced communication technology. The issuing authority, in determining whether probable cause has been established, may not consider any evidence outside the affidavits.

(D) At any hearing on a motion for the return or suppression of evidence, or for suppression of the fruits of evidence, obtained pursuant to a search warrant, no evidence shall be admissible to establish probable cause other than the affidavits provided for in paragraph (B).

Pa.R.Crim.P. 503(B), (D) (emphasis added). The Pennsylvania Supreme Court has held that "[i]n analyzing whether a warrant was supported by probable cause, judicial review is confined to the four corners of the affidavit." Commonwealth v. Coleman, 574 Pa. 261, 830 A.2d 554, 560 (2003) (citation omitted) (emphasis added), appeal denied, 581 Pa. 696, 864 A.2d 1203 (Pa.2004).

The only facts relevant to this Court's determination of the validity of the warrants are those contained within the four corners of affidavits. In Commonwealth v Edmunds, the Pennsylvania Supreme Court explained that the twin aims of Article 1, Section 8 of the Pennsylvania Constitution are "the safeguarding of privacy and the fundamental requirement that warrants shall only be issued upon probable cause." Id. at 899. Probable cause is determined based on the totality of the circumstances. Commonwealth v. Gray, 503 A.2d 921 (1985). The totality of the circumstances test is satisfied where

the police officers have a reasonable belief that the items to be seized are related to criminal conduct and that those items are presently located in the place to be searched. Commonwealth v. Jackson, 337 A.2d 582 (1975).

Consistent with these aims, to be valid, a warrant must describe the place to be searched and the items to be seized with specificity, and the warrant must be supported by probable cause. The place to be searched must be described with enough precision to allow "the executing officer to ascertain and identify, with reasonable effort, the place intended, and where probable cause exists to support the search of the area so designated, a warrant will not fail for lack of particularity." Commonwealth v. Carlisle, 501 A.2d 664 (Pa.Super.1985), aff'd 534 A.2d 469 (1987), citing In re Search Warrant B-21778, 491 A.2d 851, 856 (1985), aff'd 521 A.2d 422 (1987) (rejecting attorney's claim that place to be searched in search warrant should have been restricted to his personal office). Where a search warrant adequately describes the place to be searched and the items to be seized, the scope of the search "extends to the entire area in which the object of the search may be found..." Commonwealth v. Reese, 549 A.2d 909, 911 (1988). A warrant is unconstitutional for over breadth only when it authorizes in clear or specific terms the seizures of an entire set of items, or documents,

many of which will prove unrelated to the crime or investigation. Commonwealth v. Santer, 454 A.2d 24 (Pa. Super. 1982).

In *Santer*, the defendant filed a motion to suppress evidence obtained from his office because "the search warrants were defective in that they were overly broad in describing the items to be seized and therefore constituted unlawful general search warrants." *Id.* at 25. The warrant at issue identified the items to be seized as: "All Patient/Physician records and charts. All ledgers and bookkeeping pertaining to patients and visits." *Id.* at 26. The Superior Court determined that the warrant was improper because "[d]espite this specificity, the warrant was not restricted . . . to the files of the eight named individuals . . . Instead, it authorized the seizure of *all* of the patients' 'records and charts,' and *all* 'ledgers and bookkeeping pertaining to patients,' whether the patients were or were not taking any drugs, and whether they were current patients or had not been patients for many years." *Id.* at 27-28 (emphasis in original) (footnote omitted).

The United States Supreme Court has recognized the inherent difficulty, and, in fact, unavoidability, in ignoring *all* innocent records while searching for incriminating ones:

> "In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are in fact, among those papers authorized to be seized. Similar dangers, of course, are

27

present in executing a warrant for the 'seizure' of telephone conversations. In both kinds of searches, responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy."

*Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976). *See also Commonwealth v. Rega*, 70 A.3d 777, 785 (Pa. 2013) (acknowledging the difficulty in avoiding the search of innocuous documents).

The Affidavit of Probable Cause submitted with the request for the search warrant application for the search of Hyundai Motor Vehicle owned by the defendant alleged:

> "The City of Pittsburgh Homicide Unit is presently conducting an investigation into the poisoning death of Dr. Autumn Kline, a W/F with a date of birth of 11/30/1971. Dr. Kline resides at 219 Lytton Avenue, Pittsburgh, PA 15213.
>
> On April 17, 2013, Dr. Kline was transported by Pittsburgh Medics from her address listed above to UPMC Presbyterian Hospital unresponsive. Dr. Klein entered the emergency room unresponsive and remained unresponsive until April 20, 2013 at 1231 hours where she was pronounced deceased by Dr. Joseph Darby. Prior to the victim being taken to the Allegheny County Medical Examiner's office for an autopsy the victim's organs were retrieved by C.O.R.E. at the hospital.
>
> On April 21, 2013, Dr. Luckasevic of the Allegheny County Medical Examiner's Office performed an autopsy on the victim, and part of the autopsy procedure is to draw blood from the victim and have the blood tested for numerous drugs and chemicals.
>
> On April 22, 2013, the victim was taken to McCabe's Funeral Home, and on April 23, 2013, the victim was taken to Pittsburgh Crematory for cremation.

28

On April 23, 2013, Allegheny County Medical Investigator Kelly Vay contacted the Pittsburgh Bureau of Police Homicide Office and talked to Detective James McGee. Ms. Vay relayed the above information and informed Detective McGee the victim's blood came back and there is a high level of Cyanide in the victim's blood. Dr. Luckasevic informed Detective McGee the level of Cyanide in the victim's blood was a lethal dose and was the cause of her death.

On April 25, 2013, at 1300 hours Detectives James McGee and Robert Provident interviewed the husband of the victim, Doctor Robert Ferrante, and he informed detectives that on April 17, 2013 he was at home and the victim, his wife, came home from work around 2300 hours this same date. Dr. Ferrante stated she gave him a kiss on the cheek, stated she was not feeling good, and then passed out onto the kitchen floor. Dr. Ferrante stated the victim did not go unconscious, she was unable to speak, and had an upward gaze. Dr. Ferrante stated the victim did not go unconscious, she was unable to speak, and had an upward gaze. Dr. Ferrante stated he called 911 and the operator was giving him instructions on how to perform CPR on the victim. Dr. Ferrante stated after he got off the phone with 911 he contacted a friend, Dr. Robert Friedlander, and told him what was occurring.

During an interview with Dr. Ferrante, it was learned that he put the victim on a Creatine regimen in order to help with her trying to get pregnant. Dr. Ferrante stated the victim would take five grams of Creatine in the morning and five grams of Creatine in the evening. Dr. Ferrante said that Creatine has an awful taste, se he would mix it in a sugary drink or would mix it with cinnamon sugar and put it on the victim's toast in the morning.

Also during this interview, your affiant asked Dr. Ferrante, who is a Professor of Neurological Surgery, if he knew how the victim died. He replied she either died of a brain injury or of a heart attack. Your affiant then informed Dr. Ferrante that the victim died as a result of

29

a Cyanide poisoning. The only comment Dr. Ferrante made was "why would she do that to herself"?

Dr. Luckasevic told investigators that Cyanide has a rapid effect on humans when taken, and, if the dose is large enough, is always fatal. According to Dr. Ferrante, the victim came home and was home for several minutes then collapsed. Knowing the speedy effects of Cyanide, it is believed that the victim consumed the Cyanide at her residence.

A purchase order was obtained during the investigation showing that Dr. Ferrante purchased Cyanide on April 15, 2013. Dr. Ferrante works in a laboratory where he has access to Cyanide. It was learned from Doctor Maria Baldwin that the victim did not work in a research laboratory, she did not do any bench work in a laboratory, and all of her work was involved in patient care.

Your affiant is requesting a search warrant for the vehicle of Doctor Robert Ferrante, which is a 2011 Hyundai Pennsylvania plat HVL-7823, to search for any items that may be used to store, transport, or administer the delivery of Cyanide. Also to search for any computers, or laptops, that may have stored information pertaining to Cyanide, or any and al literature pertaining to Cyanide, or chemical logs that would track the usage or distribution of Cyanide."

(Search Warrant No. MD2244-2013).

The defendant, in his motion, challenged the warrant on several bases:  that the affidavit did not establish probable cause; that the affidavit contained information previously obtained unlawfully; that the warrant was overbroad; that the affidavit included false statements and/or that the area or items to be searched was not adequately described.  No evidence was presented at the suppression hearing as

30

to his motion. Accordingly, the claims that the affidavit contained information that had been illegally obtained or contained falsehoods were, in essence, abandoned at the hearing as additional evidence would had to have been presented to establish those claims. No such evidence was presented.

As for the sufficiency of the affidavit, this claim was without merit. The facts set forth above established that the victim died from cyanide poisoning; that because cyanide is fact acting she likely ingested it when she was home with the defendant and her daughter; that the defendant purchased cyanide *two days* prior to his wife's death and had access to cyanide at his laboratory. These facts were more than sufficient to establish probable cause to believe that some evidence of cyanide, including trace amounts in the car or in containers within the car, might be present. The officers knew that cyanide was accessible to the defendant at his laboratory and knew that the victim ingested cyanide at home. These facts supported the conclusion that the cyanide had to be moved from the defendant's office to the home and the most likely means to do so was the defendant's vehicle.

Moreover, there was evidence that the cyanide had only recently been ordered. Computers and other electronic devices are likely to have records of any purchases made online, either through web

browser histories, e-mail order confirmations or receipts.  They may also reveal internet searches about the effects of cyanide. The affidavit clearly provided sufficient facts to allow a judge to conclude that such evidence might be present on computers and other electronic devices accessible to the defendant.  The warrants did not permit the search of the contents of the electronic devices; only their seizure. The searches for the content were the subject of subsequent warrant applications.

The next three applications for search warrant, involving the 20th, 21st, and 28th the Motion to Suppress, relied on Affidavits of Probable Cause that set forth, nearly verbatim, the same facts.  They were significantly longer than the affidavit quoted from above, but set forth essentially the same factual circumstances surrounding the death of Autumn Klein. The first portion of the affidavits recounted the training and education of the affiant. The second provided a summary of the relevant technology, explaining the various technical aspects of computers and internet searches. The third section of the affidavits set forth, in terms very similar to that set forth above, the history of the investigation. The final section identified the various electronic items, including computers, cell phones, smart phones and various storage devices that had been seized pursuant to earlier search warrants that law enforcement now wanted to access.  These warrants sought

authority to examine the contents of the various devices to search for specific and particular information.

The search warrant challenged in the 20th Motion to Suppress sought authorization to search the contents of MacBook Air laptop with a serial number of C02D94JRDDR4. The 21st Motion challenged the warrant for the search of the contents of a MacBook Air laptop with a serial number of C02D94BODDRO while the28th Motion challenged the warrant permitting the search of the contents of an external hard drive identified as the "G Tech External HDD".

As to each of these search warrants, the affidavits clearly set forth sufficient basis to believe the evidence of the crimes committed could be found in the data stored on the these devices; the two laptop computers and the external hard drive. The affidavits stated the following, as to each of the items:

> Your affiant avers that those who possess laptop computers such as the Apple MacBook or laptop [serial number omitted] normally incorporates and uses such a device or item on a regular, routine basis. Electronic devices, advances the technology and/or in items such as this have allowed one's ability to create, store, search or communicate documents, messages, ideas, images or other data more conveniently and with greater ease than ever before. This date, once created, is normally retained within the item or device. These items or devices may also be thought of as a storage container from which evidence of a crime may be recovered. In this instance, your affiant avers that amount the data contained therein is **evidence regarding the means, research, planning, motive, commission and/or the identification of suspects**

***and/or suspect collaboration with others.***
Common motives include murder for gain, revenge,
elimination, jealousy or lust of killing. In addition,
***forensic analysis of these items may indicate***
***whether any of the aforementioned data sought***
***by law enforcement pursuant to this investigation***
***has been modified or deleted in any manner.***

(Commonwealth Exhibit 11, Suppression Hearing, Emphasis added).

Each of these search warrants then used exactly the same language in

describing what data was to be searched for and seized:

1. Contents containing in whole or in part evidence of
means, research, planning, motive, commission and or
suspect identity and/or collaboration with others regarding
the suspected criminal homicide of Dr. Autumn Klein,
including but not limited to: letters, documents, email
contents, history or any other communication or
correspondence including the identification of email
addresses, user names or similar contact  or address type
data, web browser and/or internet search histories;
images, graphic, videos, documents; all of the
aforementioned to include any deleted data.

2. Indicia or use, ownership or control over the item to be
searched.

3. Any data or evidence indicating attempts or act
intended to conceal or prevent the discovery of the crime
of criminal homicide, including any data deletion.

4. Financial documents or other data reflecting checking,
saving or investment accounts, transactions or records of
Dr. Autumn Klein, Dr. Robert Ferrante, and/or others
including financial intuition names, account numbers and
addresses.

All forensic searches to be conducted by Pennsylvania
State Police Computer Crimes Unit Trooper D. Scott Lucas
and/or other members under his supervision and/or

control and pursuant to standard forensic methods and practices as determined by Tpr. Lucas.

The items to be sought in the search were items that would be evidence relevant to establishing "... means, research, planning, motive, commission and or suspect identity and/or collaboration with others regarding the suspected criminal homicide of Dr. Autumn Klein." This was not a blanket authorization to go fishing in these computers for anything and everything. The search was limited to data that fit within this limitation.

In Commonwealth v. Orie, 88 A.3d 983 (Pa. Super 2014), the Superior Court held that applications seeking authority to search the data on previously seized computers were not overbroad where they identified the specific data that they were searching for. In Orie, the data was information relevant to political campaign activities as the charges in that case involved her use of state employees to perform such activities while being paid by the state. Because the data requested as specified, the warrant was not overbroad.

The warrant applications for these three warrants also specifically identified data that would be relevant to the crime charged. The Commonwealth was only seeking data that would show, "...means, research, planning, motive, commission and or suspect identity and/or collaboration with others regarding the suspected criminal homicide of Dr. Autumn Klein." In addition, the warrant

35

sought any "indicia of use, ownership or control" over the item being searched. Certainly, evidence showing that that the defendant had access to or control over the computer or other electronic device was certainly relevant.

The Commonwealth indicated that it would use standard forensic methods to search for and secure the evidence that fit within the parameters set forth in the application. It was not a fishing expedition and the Commonwealth neither requested nor was granted access to all data on any of these devices. The applications identified the items to be searched for with sufficient particularity and the Motions to Suppress that evidence were properly denied.

In the 60th Motion, again, the Affidavit of Probable Cause is nearly identical to those described above, setting forth the affiant's education, experience and training, the technical aspects of computers, as well as a history of the case. In this Affidavit, the Commonwealth sought authorization to search the contents of another computer that had been seized pursuant to an earlier search warrant. That warrant led to the seizure of a safe in the defendant's office. After obtaining a warrant authorizing the search of the safe, the Commonwealth discovered that the safe contained a computer. The computer had been secured in the safe since its original seizure seven months previously.

As with the affidavits submitted with the applications for the search warrants addressed above, the affidavit and application specifically identified the data that would be sought in the forensic analysis of this computer. It was not overbroad.

In the 38th Motion to Suppress, the defendant seeks to suppress evidence obtained as a result of a warrant that authorized the search of the contents of the defendant's g-mail account. Once again, the Affidavit of Probable Cause laid out the history of the investigation of this matter as set forth earlier in this Opinion. With regard to the mail account, the affiant stated the following:

> On May 31, 2013, your affiant was provided additional investigative information from the University of Pittsburgh, including email account information for Dr. Ferrante. Among the email accounts provided for Dr. Ferrante was the Gmail account rjferr25@gmail.com.
>
> Your affiant is aware that Gmail is a free email service provided by Google, and that rjferr25@gmail.com appears to be a valid Gmail email address. Your affiant also avers that Google maintains the following initial information from those who first subscribe to the Gmail service:
>
> - First and last name
> - Birthday
> - Gender
> - Mobile Phone number
> - Current email address
> - Location (i.e., USA)
>
> Google also maintains email content from the Gmail accounts, including sent, received, draft and deleted emails indefinitely. Your affiant is also aware that Google internet searches conducted while logged in

37

under a Gmail account may be stored by Google as well.

Your affiant avers that subscriber information and email content of rjferr25@gmail.com will provide information pertinent to the ongoing criminal homicide investigation, and requests that the contents of this account from January 1, 2013 to date of this search warrant, including incoming, outgoing, draft and deleted content be provided.

Your affiant avers that those who subscribe and have access to electronic mail (email) normally incorporate and use such a device or items on a regular and routine basis. Electronic mail, advances in technology and/or items such as this have allowed one's ability to create, store, search or communicate documents, messages, ideas, images or other data more conveniently and with greater ease than ever before. This data, once created, is normally retained within the item or device. These items or devices may also be thought of as a storage container from which evidence of a crime may be recovered. In this instance, your affiant avers that among the data contained therein is evidence regarding the means, research, planning, motive, commission and/or the identification of suspects and/or suspect collaboration with others. Common motives include murder for gain, revenge, elimination, jealousy or lust of killing. In addition, forensic analysis of these items may indicate whether any of the aforementioned data sought by law enforcement pursuant to this investigation has been modified or deleted in any manner."

The Court is satisfied that the affidavit of probable Cause established the likelihood that evidence could be found in the contents of the defendant's Gmail account and that the application was sufficiently specific about what data would be sought.

Next, the defendant contends that the Court erred in denying his claim that he was entitled to a new trial due to a Brady violation. The defendant contends that the Commonwealth failed to disclose that Nichols Institute of Diagnostics, Inc.. was convicted of a criminal offense involving dishonesty . Attached to the Post Trial Motion and marked exhibit C is a copy of the judgment of sentence in The United States of America v. Nichols Institute of Diagnostics, Inc., case number 09-CR-0203-SJ, in which the corporate defendant pleaded guilty to one count violating 21 USC § 333(a)(2). A fine of 30 million dollars was imposed a result of that conviction. The Criminal Information, also attached as an exhibit, states that Nichols Institute of Diagnostics, Inc., a California corporation at the time, misbranded or mislabeled a testing device they manufactured. Another document, a memo from the Department of Justice, states that Nichols Institute of Diagnostics is a subsidiary of Quest Diagnostics, Inc. and that the guilty plea that Nichols made was pursuant to a global settlement in which Quest Diagnostics also settled a civil matter related to the same allegations.

This claim is specious. Quest Diagnostics did not plead guilty to a crime. A subsidiary, Nichols Diagnostic, did. More importantly, Quest Diagnostics did not testify in this trial. Four employees of Quest, Leslie Edinboro, Sonia Obcemea, Ryan Bartolotti and Michael Browne

39

did. They described the testing of the blood sample taken from the victim that was determined to contain cyanide. None of these witnesses could have been impeached with evidence that a subsidiary of the corporation they worked for was convicted in an unrelated criminal matter. A witness may be impeached by the witness's own conviction for a crime of falsehood because a crime of falsehood calls into question the witnesses credibility or honesty. A conviction of a corporate entity that employs the witness says absolutely nothing about the credibility of the individuals employed by that corporation, particularly when there is no suggestion that these particular employees had anything to do with the conduct that led to the conviction.

The defendant next two claims raise challenges to the weight of the sufficiency of the evidence. The standard to be applied in reviewing a challenge to the sufficiency of the evidence is " ... whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." Commonwealth v. Passmore, 857 A.2d, 697, 706 (Pa. Super 2004). The Court in Passmore went on to note:

> In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need

40

not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Ibid*, at 706-707.

Applying this test to the evidence presented makes it abundantly clear that the evidence in this case was sufficient to sustain the jury's verdict. The Commonwealth presented expert testimony which opined that the Autumn Klein's death was caused by cyanide poisoning. They presented expert testimony from those who tested a sample of her blood who stated that it contained lethal levels of cyanide. Although the defense attacked the validity of the test of the blood for the presence of cyanide, it is apparent that the jury accepted the explanation proffered by Quest employer Bartolotti regarding his error that lead to the seemingly inconsistent results.

The Commonwealth also offered circumstantial evidence which, taken in a light favorable to the Commonwealth as the verdict winner, tended to corroborate the Commonwealth's theory that the defendant used cyanide to poison his wife. The most compelling of the

41

circumstantial evidence is, quite simply, the timeline. Dr. Klein was seen on security video leaving Presbyterian Hospital in no apparent distress. According to the defendant, within minutes of arriving home, she collapsed on the floor and was soon non-responsive, as she remained until her death two days later. All of the medical experts who testified that such a collapse would occur within minutes of a person ingesting cyanide. The medical experts also were in agreement that the physical symptoms she exhibited at the scene and later at the hospital were consistent with cyanide poisoning, although the Commonwealth experts also indicated that such symptoms could be consistent with other causes of death, although none were able to identify such other cause of death.

Finally, there was circumstantial evidence consisting of emails between the victim and the defendant which suggested marital difficulties as well as the defendant's internet searches surrounding cyanide poisoning, both before and after his wife's collapse. Of particular relevance would be those searches that he conducted on his computer after his wife's collapse but before the detectives advised him that his wife had died of cyanide poisoning. Searches on his computer for information as to how difficult it is for a medical examiner to detect the presence of cyanide is certainly suspicious of a guilty mind. Although the defendant explained that he had learned

that there was a pending cyanide test prior to being told that his wife had died from cyanide poisoning, his daughter's testimony regarding how she came to learn of that was inconsistent. She initially stated on direct examination that she was told about the cyanide testing by a "cardiologist or cardio-thoracic surgeon..." (IV, 223) but, later, claimed to have overheard two nurses talking about it. Moreover, neither her nor her father mentioned the cyanide test when the police first advised them that the cause of death was cyanide poisoning. The jury was certainly free to assess the credibility of this explanation in rendering their verdict.

Ultimately, this verdict in this case turned on the expert testimony. As with any witness, a jury is free to believe some, none or all of the testimony of an expert witness. It is for the fact finder to ascertain what happened based on that, and other, testimony. It was for the jury to decide if they accepted the opinion of the Commonwealth witnesses on the issue of causation or if the testimony of the defendant's witnesses were sufficient to raise a reasonable doubt. By their verdict, the jury made it clear that they credited the testimony of the Commonwealth's witnesses. Once the jury determined that Dr. Klein's death was caused by cyanide, the remaining circumstantial evidence was certainly sufficient to prove that the defendant caused her to ingest the cyanide that killed her. The

Court is satisfied that the evidence in this matter was sufficient to support that finding and support the verdict of guilty.

The weighing of evidence is the exclusive province of the fact finder. As was pointed out above, the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. A reviewing court cannot substitute its judgment for that of the finder of fact and may only reverse a jury's verdict if it is so contrary to the evidence as to shock one's sense of justice. Commonwealth v. Begley, 780 A.2d 605, 619 (2001). This jury's verdict was not, in any way, contrary to the evidence presented. It was consistent with the evidence presented by the Commonwealth. That the jury credited that evidence over the evidence presented by the defendant is not a basis for claiming that the verdict was against the weight of the evidence. This Court's sense of justice was not shocked by the verdict. Accordingly, the Post Trial Motion seeking a new trial on the basis that the verdict was against the weight of the evidence was properly denied.

Finally, the defendant contends the Court erred in failing to comply with the requirements of Pennsylvania Criminal Procedure 532 (I) by not issuing written findings of fact and conclusions of law at the time the suppression motions were denied. The purpose of this rule to provide the reviewing court with the facts as found by the suppression

44

court and the legal reasoning that led to the Court's suppression decision.   This Court has done that in this Opinion as to those suppression rulings that the defendant is challenging in this appeal. The Court set forth its factual findings as to each of the six suppression rulings identified in the Amended Concise Statement of Errors  and explained its legal reasoning as to each ruling.  The reviewing court thus has everything it will need to address the defendant's claim that this Court erred in denying those motions.

For the reasons set forth, the defendant's judgment of sentence should be affirmed.

BY THE COURT:

Date: 6/13/16 _____ , P.J.